47 F.2d 288 (1931)
UNITED STATES
v.
STANDARD OIL CO OF NEW JERSEY et al.
SAME
v.
STANDARD OIL CO. OF NEW YORK et al.
No. 5371.
District Court, E. D. Missouri.
February 7, 1931.
John Lord O'Brian, Asst. to Atty. Gen., and John Harlan Amen, Sp. Asst. to Atty. Gen. (William D. Mitchell, Atty. Gen., and *289 Charles H. Weston, Wendell Berge, W. B. Watson Snyder, and Israel B. Oseas, Sp. Assts. to Atty. Gen., and Louis H. Breuer, U. S. Atty., of Rolla, Mo., on the brief), for the United States.
Walker D. Hines and G. H. Dorr, both of New York City, and Lon O. Hocker, of St. Louis, Mo. (A. C. Rearick, Austin T. Foster, L. M. Treadwell, William B. Hubbell, and Hines, Rearick, Dorr, Travis & Marshall, all of New York City, on the brief), for defendants.
Before STONE, BOOTH, and GARDNER, Circuit Judges.
STONE, Circuit Judge.
Heretofore, the United States brought suit against various individual, associated, and corporate parties for violation of the Sherman Anti-Trust Act (15 USCA §§ 1-7, 15) through a conspiracy to restrain interstate and foreign commerce in petroleum and its products and to monopolize such commerce in that regard. In that action, this court entered its decree against seven individual and thirty-eight corporate defendants, including the Standard Oil Company of New York and the Vacuum Oil Company. (C. C.) 173 F. 177, 197. With minor modifications, that decree was affirmed. 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. The only modification affecting the present proceeding was that "the court below to retain jurisdiction to the extent necessary to compel compliance in every respect with its decree." 221 U. S. 1, 82, 31 S. Ct. 502, 524, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. The original decree was modified, in the respects directed by the Supreme Court, by an entry of record in this court dated July 29, 1911. Thereafter, the decree, in so far as dissolution of the existing unlawful organization was concerned, was fully executed. The New Jersey company (the old holding company) distributed the stocks to the subsidiary corporations, and for almost twenty years the Standard Oil Company of New York and the Vacuum Oil Company (two of such subsidiaries) have existed and conducted their businesses entirely independently of each other and of the other parties to the old combination.
Under this retained jurisdiction "to compel compliance," the United States files this supplemental petition to prevent a contemplated merger of the Standard Oil Company of New York and the Vacuum Oil Company. A certificate of expedition has been filed by the United States and the matter heard by three Circuit Judges under the statute. USCA title 15, § 28. Evidence has been taken by a master, and such evidence, with an excellent summary thereof by the master, has been filed. The defendants will hereafter be designated as Vacuum and as Socony (the trade-name of the Standard Oil Company of New York).
Such petition alleges that these two companies are contemplating a merger, and that such merger is in violation of the above decree. The companies admit the contemplated merger, but deny that it is in violation of the decree. Therefore, whether the decree will be violated by the merger depends upon what the decree enjoined and whether the merger is shown by the evidence to be within the things and matters enjoined. The parties differ widely as to the meaning of the decree and as to the effect of the evidence.
The controversy is over the proper construction of the decree and the effect of the evidence upon the decree so construed. Naturally, the first matter for determination is the construction of the decree.

I. Construction of the Decree.
The decree (sections 1 to 4, inclusive) declared that the Standard Oil Company of New Jersey held a majority of the capital stock of the other companies, and exercised complete control thereover; that this arrangement was in pursuance of a conspiracy to, and resulted in a combination to, restrain trade in violation of section 1 of the Anti-Trust Act; and that such combination was a monopoly in violation of section 2 of the act. Sections 5 to 7, inclusive, set forth the remedy applied by the court. Section 7 (as modified) enjoined the named defendants from engaging in interstate commerce after a six-month period allowed for dissolution of the combination. Section 5 enjoined the New Jersey company from voting the stock of, or exercising any control over, the subsidiaries, and enjoined the subsidiaries from declaring or paying any dividends to the New Jersey company and from permitting it to exercise any control over them, but the defendants were permitted to distribute the shares in the several corporations ratably to the shareholders of the New Jersey company. These two sections (5 and 7) were designed to compel dissolution of the existing combination by distribution to the stockholders of the New Jersey company of the shares in the several companies held by it, so that such companies would go forward as separate units, freed from the central control and domination of *290 the New Jersey company. Section 6 was designed to meet the situation after the above dissolution and to prevent a re-creation or reformation of another and new combination by any participant in the existing combination  it was to preserve, as to such participants, the situation designed to be brought about by section 5, that is, a continued effective dissolution of the unlawful combination. Section 5 has been fully complied with. We are here concerned with section 6. Therefore, the controversy here is over the meaning of section 6. That section is as follows:
"Section 6. That the defendants named in section 2 of this decree, their officers, directors, agents, servants, and employees are enjoined and prohibited from continuing or carrying into further effect the combination adjudged illegal hereby, and from entering or performing any like combination or conspiracy, the effect of which is, or will be, to restrain commerce in petroleum or its products among the States, or in the Territories, or with foreign nations, or to prolong the unlawful monopoly of such commerce obtained and possessed by defendants as before stated, in violation of the act of July 2, 1890, either (1) by the use of liquidating certificates, or other written evidences, of a stock interest in two or more potentially competitive parties to the illegal combination, by causing the conveyance of the physical property and business of any of said parties to a potentially competitive party to this combination, by causing the conveyance of the property and business of two or more of the potentially competitive parties to this combination to any party thereto, by placing the control of any of said corporations in a trustee, or group of trustees, by causing its stock or property to be held by others than its equitable owners, or by any similar device; or (2) by making any express or implied agreement or arrangement together, or one with another, like that adjudged illegal hereby, relative to the control or management of any of said corporations, or the price or terms of purchase, or of sale, or the rates of transportation of petroleum or its products in interstate or international commerce, or relative to the quantities thereof purchased, sold, transported, or manufactured by any of said corporations which will have a like effect in restraint of commerce among the States in the Territories, and with foreign nations to that of the combination the operation of which is hereby enjoined."
The pertinency of section 6 is that it forbids, under conditions therein expressed, "the conveyance of the physical property and business" of one of these defendants to another, and that the contemplated merger confessedly intends the conveyance of the property and business of the Vacuum to the Socony.
The construction contended for by the plaintiff is as follows:
"Section 6 sets out specific acts which the court will consider as tending to recreate the old combination or tending to create a similar one, and that the court will, therefore, consider such conduct to be a violation of the decree." Plf. Br., p. 40. The same thought is again expressed as that the decree forbids "certain types of transactions which were considered unlawful because tending to defeat the purpose of the decree. The types of agreement which the court does not consider normal and lawful under the circumstances are set out in Section 6 of the decree, and among such unlawful agreements are combinations of competitors, because such combinations do tend to recreate the illegal combination dissolved." Plf. Br., p. 51.
The construction urged by the defendants is as follows:
"* * * In Section 6, it [the trial court] directed the language of injunction against the continuing of the old and the `entering or performing of any like conspiracy or combination the effect of which is, or will be, to restrain commerce * * * in violation of the Act of July 2, 1890,' by various enumerated acts instead of as in Section 5 specifically enjoining the doing of particular acts without any reference to whether or not they constituted the entering or performing any combination or conspiracy. The court thus clearly recognized that the particular acts referred to in Section 6 might or might not be an `entering or performing of any like combination or conspiracy,' and that these or any similar devices only come within the purview of the decree when by doing them the defendants are in fact entering or performing such combination or conspiracy. The court did not attempt to forbid absolutely under all future circumstances particular transactions which would normally be lawful and which would only be unlawful if in fact done as a part of or in effecting that `like combination or conspiracy' which this decree in terms enjoins the defendants from `entering or performing.'" Def. Br., p. 96.
Therefore, the controversy concerning the proper construction of section 6 is whether it enjoined the doing of the enumerated acts absolutely and irrespective of their effect, or *291 whether it enjoined such acts only if they had the effect of entering into or performing a like conspiracy to restrain or monopolize interstate commerce.
When this decree was on appeal in the original suit, section 6 was the subject of specific attack by the then appellants.[1] In response to such attack, the Supreme Court placed a construction upon the section. That construction entirely covers the line of cleavage now presented. Therefore, our duty is to state the construction made by that court rather than to attempt any independent construction of our own. Such construction is to be found on pages 77 to 81 of 221 U. S., with particular attention to pages 80 and 81 thereof (31 S. Ct. 523, 524).
In dealing with the various controversies presented to it, the Supreme Court divided its opinion into four main headings, of which the fourth was stated as "The Remedy to Be Administered." Page 77 of 221 U. S., 31 S. Ct. 523. The meaning and effect of section 6 is one of the matters examined and disposed of under this heading.
In opening its discussion under the above heading, the court announces that ordinarily sufficient relief would be afforded by restraining the acts found to be unlawful, but where, as here, there is "not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies," and, as the act does not authorize penalties, "it follows that to meet the situation with which we are confronted the application of remedies two-fold in character becomes essential: 1st, to forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute," and, second, to effectually dissolve the existing unlawful combination. In applying those remedies, the court states that "the fact must not be overlooked that injury to the public by the prevention of an undue restraint on, or the monopolization of, trade or commerce, is the foundation upon which the prohibitions of the statute rest, and moreover that one of the fundamental purposes of the statute is to protect, not to destroy, rights of property." Page 78 of 221 U. S., 31 S. Ct. 502, 523. The court then proceeds to an examination of the decree "in order to fix how far it is necessary to take from or add to that relief, to the end that the prohibitions of the statute may have complete and operative force." Page 78 of 221 U. S., 31 S. Ct. 502, 523. The court then summarizes the decree, and afterwards states its determination as to the propriety of various features thereof. In its summary of the decree, as to section 6, the court says:
"So far as the owners of the stock of the subsidiary corporations and the corporations themselves were concerned after the stock had been transferred [by the holding New Jersey Company to the subsidiary companies according to the permission in section 5 of the decree], § 6 of the decree enjoined them from in any way conspiring or combining to violate the act, or to monopolize or attempt to *292 monopolize in virtue of their ownership of the stock transferred to them, and prohibited all agreements between the subsidiary corporations or other stockholders in the future, tending to produce or bring about further violations of the act." Page 79 of 221 U. S., 31 S. Ct. 502, 523.
Its determination as to the propriety of section 6 is thus stated (page 80 of 221 U. S., 31 S. Ct. 502, 524):
"But the contention is that, in so far as the relief by way of injunction which was awarded by § 6 against the stockholders of the subsidiary corporations or the subsidiary corporations themselves after the transfer of stock by the New Jersey corporation was completed in conformity to the decree, that the relief awarded was too broad: a. Because it was not sufficiently specific, and tended to cause those who were within the embrace of the order to cease to be under the protection of the law of the land and required them to thereafter conduct their business under the jeopardy of punishments for contempt for violating a general injunction. New Haven R. R. v. Interstate Commerce Commission, 200 U. S. 404, 26 S. Ct. 272, 50 L. Ed. 526. [b] Besides it is said that the restraint imposed by § 6  even putting out of view the consideration just stated  was, moreover, calculated to do injury to the public, and it may be in and of itself to produce the very restraint on the due course of trade which it was intended to prevent. We say this since it does not necessarily follow because an illegal restraint of trade or an attempt to monopolize or a monopolization resulted from the combination and the transfer of the stocks of the subsidiary corporations to the New Jersey corporation that a like restraint or attempt to monopolize or monopolization would necessarily arise from agreements between one or more of the subsidiary corporations after the transfer of the stock by the New Jersey corporation. For illustration, take the pipe lines. By the effect of the transfer of the stock, the pipe lines would come under the control of various corporations instead of being subjected to a uniform control. If various corporations owning the lines determined in the public interests to so combine as to make a continuous line, such agreement or combination would not be repugnant to the act, and yet it might be restrained by the decree. As another example, take the Union Tank Line Company, one of the subsidiary corporations, the owner practically of all the tank cars in use by the combination. If no possibility existed of agreements for the distribution of these cars among the subsidiary corporations, the most serious detriment to the public interest might result. Conceding the merit, abstractly considered, of these contentions, they are irrelevant. We so think, since we construe the sixth paragraph of the decree, not as depriving the stockholders or the corporations, after the dissolution of the combination, of the power to make normal and lawful contracts or agreements, but as restraining them from, by any device whatever, recreating, directly or indirectly, the illegal combination which the decree dissolved. In other words, we construe the sixth paragraph of the decree, not as depriving the stockholders or corporations of the right to live under the law of the land, but as compelling obedience to that law. As therefore the sixth paragraph as thus construed is not amenable to the criticism directed against it and cannot produce the harmful results which the arguments suggest, it was obviously right."
From the above statement and accompanying quotations from the report of the case in the Supreme Court, it is clear that section 6 of the decree was directly challenged as having the effect of preventing the defendants from dealing with each other in the particulars specified in that section  one of which was "the conveyance of the physical property and business"; this apprehended effect was illustrated, in argument, by the pipe line properties which were originally owned by eleven companies. Also, it is clear that the court met this presented situation squarely by stating and disposing of it. It said: "* * * It does not necessarily follow because an illegal restraint of trade or an attempt to monopolize or a monopolization resulted from the combination and the transfer of the stocks of the subsidiary corporations to the New Jersey corporation that a like restraint or attempt to monopolize or monopolization would necessarily arise from agreements between one or more of the subsidiary corporations after the transfer of the stock by the New Jersey corporation." Page 80 of 221 U. S., 31 S. Ct. 502, 524. Then the court cites two illustrations of such situations which, from the evidence, might arise. The first of these illustrations involved a combination of business facilities and the other the transfer of possibly the entire property of one of the subsidiaries to other subsidiaries. The court said: "For illustration, take the pipe lines. By the effect of the transfer of the stock [from the New Jersey company], the pipe lines would come *293 under the control of various corporations instead of being subjected to a uniform control. If various corporations owning the lines determined in the public interests to so combine as to make a continuous line, such agreement or combination would not be repugnant to the act, and yet it might be restrained by the decree. As another example, take the Union Tank Line Company, one of the subsidiary corporations, the owner practically of all the tank cars in use by the combination. If no possibility existed of agreements for the distribution of these cars among the subsidiary corporations, the most serious detriment to the public interest might result." Pages 80, 81 of 221 U. S., 31 S. Ct. 502, 524. Then the court disposes of these contentions by saying: "Conceding the merit, abstractly considered, of these contentions, they are irrelevant." Page 81 of 221 U. S., 31 S. Ct. 502, 524. Then the court states that the reason they are irrelevant is because section 6, when properly construed, is not subject to such meaning or as having such effects. It says: "We so think [that these contentions are irrelevant], since we construe the sixth paragraph of the decree, not as depriving the stockholders or the corporations, after the dissolution of the combination, of the power to make normal and lawful contracts or agreements, but as restraining them from, by any device whatever, recreating, directly or indirectly, the illegal combination which the decree dissolved. In other words, we construe the sixth paragraph of the decree, not as depriving the stockholders or corporations of the right to live under the law of the land, but as compelling obedience to that law. As therefore the sixth paragraph as thus construed is not amenable to the criticism directed against it and cannot produce the harmful results which the arguments suggest, it was obviously right." Page 81 of 221 U. S., 31 S. Ct. 502, 524. Among the "harmful results" suggested in the arguments were that section 6 would prevent mergering of business and transfers of property from one subsidiary to another; the court had so stated its understanding of the arguments; and, in answer, had declared that such contentions were irrelevant and such criticism of the section not justified and such harmful results not produced thereby because that section forbade only such contracts or agreements as directly or indirectly would continue or re-create "the illegal combination which the decree dissolved." This but stated as to section 6 what the court had stated generally as to the "Remedy to be Administered"; that it was essential "to forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute." Page 78 of 221 U. S., 31 S. Ct. 502, 523. Through all of these statements by the court runs the thought and expression that only such future acts are prohibited as would violate, or tend to violate, the act.
Nor is this all. Mr. Justice Harlan concurred in the "general affirmance of the decree" (page 106 of 221 U. S., 31 S. Ct. 502, 534), but dissented from the construction of the Anti-Trust Act and from the modification of the decree. As to the latter he says:
"In my judgment, the decree below should have been affirmed without qualification. But the court, while affirming the decree, directs some modifications in respect of what it characterizes as `minor matters.' It is to be apprehended that those modifications may prove to be mischievous. In saying this, I have particularly in view the statement in the opinion that `it does not necessarily follow because an illegal restraint of trade or an attempt to monopolize or a monopolization resulted from the combination and the transfer of the stocks of the subsidiary corporations to the New Jersey corporation, that a like restraint of trade or attempt to monopolize or monopolization would necessarily arise from agreements between one or more of the subsidiary corporations after the transfer of the stock by the New Jersey corporation.' Taking this language, in connection with other parts of the opinion, the subsidiary companies are thus, in effect, informed  unwisely, I think  that although the New Jersey corporation, being an illegal combination, must go out of existence, they may join in an agreement to restrain commerce among the states if such restraint be not `undue.'" Pages 82, 83 of 221 U. S., 31 S. Ct. 502, 525.
There is much present significance in "the subsidiary companies are thus, in effect, informed * * * that * * * they may join in an agreement to restrain commerce among the states if such restraint be not `undue.'" It cannot be doubted that Mr. Justice Harlan took part in conferences of the Court in determining this very important appeal  one of the issues of which was the meaning and effect of section 6. It cannot be doubted that an issue so serious as the meaning and effect of section 6 was fully discussed in those conferences. Certainly the opinion expressed the result of such consultations. It is hardly possible that Mr. Justice Harlan *294 could have misunderstood the effect intended. Also, this dissenting opinion must have been known to the members of the Court before the majority opinion was filed, and it cannot be supposed that the majority opinion would have been thereafter filed in its present form if the construction placed by Mr. Justice Harlan on this portion as to section 6 had been a misconception of its meaning. We cannot believe the Justice would have used such language if the majority opinion had meant that the acts designated in section 6 were forbidden absolutely and without reference to the effect of them. Indeed, if such had been the meaning, he would have had no reason to dissent therefrom. When we have the clear language of the opinion concerning section 6 and the construction of that language in the dissenting opinion, it leaves no doubt in our minds that such construction was as follows: That the subsidiary companies were enjoined from entering into the character of contracts named in that section only if such contracts constituted "an entering or performing any like combination or conspiracy, the effect of which is, or will be, to restrain commerce in petroleum or its products among the States, or in the Territories, or with foreign nations" or the effect of prolonging the then existing unlawful conspiracy and combination.
The plaintiff argues that all of this language of the Supreme Court must be regarded as recognizing that the acts specifically set forth in section 6 would in and of themselves tend to re-create the combination or create a similar one, and that the two illustrations used by the court (pipe lines and tank cars) were of noncompetitive subsidiaries. The difficulty with this position is as follows: The Supreme Court nowhere in its opinion states or intimates that any of these specific acts in and of themselves, ordinarily or viewed in the light of the evidence in the record before it, has any such effect. To the contrary, it declares the remedy should be such as "to forbid the doing in the future of acts like those which we have found to have been done in the past which would be violative of the statute" (italics ours), page 78 of 221 U. S., 31 S. Ct. 502, 523, and finds the remedy provided in section 6 does do that by prohibiting "all agreements between the subsidiary corporations or other stockholders in the future, tending to produce or bring about further violations of the act" (italics ours), page 79 of 221 U. S., 31 S. Ct. 502, 523. And, as to the illustrations, it is more than strange, if they were selected because of their noncompetitive character, that the court should make no mention of that cardinal distinguishing characteristic governing the selection of them.
Plaintiff argues that, in disposing of section 6, "the court was considering the argument that section 6 was too obscure, too indefinite; that it tended to cause defendants to exist under the peril of a citation in contempt for violating the law; that it was a mere injunction to obey the law"; and that its language construing section 6 was used in connection with, or answer to, such argument. Unquestionably, the court was answering that argument, but it was doing more. It was, also, answering the argument directed more specifically to the claimed inhibition upon all combination or property transfer between the subsidiaries  which was illustrated by the pipe line and tank car situations. The force of this position of the plaintiff disappears, unless the court was answering only the general argument as to obscurity, indefiniteness, et cetera. We think the language of the court was not so confined.
Plaintiff advances various arguments as to what the construction of this section of the decree should be. Were this court free to construe the section, such arguments would be entirely pertinent. However, when the Supreme Court has, as here, definitely and clearly construed that section in all particulars material to the present suit, the matter of what should be the construction has, as to this court, passed into what is the construction so declared.
There is, and could be, no contention here that the present contemplated merger is a continuance, carrying into further effect, or a prolongation of the conspiracy and monopoly found to exist in the main suit. The contention is, and must be, that it is an entirely new undertaking. Therefore, as applied to the situation now before us, our conclusion is that the Supreme Court has construed section 6 as enjoining a merger or a transfer of property between the subsidiary corporations which are potentially competitive only if and when such merger or transfer, at the time it may occur, constitutes an "entering or performing any like combination or conspiracy, the effect of which is, or will be, to restrain commerce in petroleum or its products among the States, or in the Territories, or with foreign nations"  "like" not referring to form but to effect, that is, violative of the act.

*295 II. As to Violation of the Decree.[2]

1. Applicable Rule of Law.
It is obvious that such a merger would be an "entering" of a "combination" by the acting subsidiaries. Whether such merger would be a "conspiracy" would depend upon the actuating intent. Whether, absent such intent, the "combination" would be a "like" combination and come within the decree would depend upon whether it would have "the effect * * * to restrain commerce in petroleum or its products among the States, or in the Territories, or with foreign nations" in violation of the act. Therefore, whether the decree is violated by this merger involves *296 (a) existence of an intent to so restrain commerce or (b) the effect of resulting in such restraint.
(a) Intent. There is no direct evidence in this record of any such intent to restrain commerce. The only direct evidence is to the contrary (as will appear hereinafter in connection with the situation showing the real reasons for this merger). That evidence, introduced by the defendants, is to the effect that the intent and purpose of this merger is solely to meet the normal and natural business necessities of the two companies brought about by the development of, and the changed competitive and business conditions in, the industry. The plaintiff does not contend that an intent to monopolize or to so restrain commerce is a moving purpose of the merger. If such intent exists, it must rest upon the rule that an intent to accomplish a result may be inferred from the natural consequences of an act, as shown by the evidence. Whether that rule is here applicable need not be determined because, if the effect  the result  of the merger is to so restrain commerce, it is unnecessary to concern ourselves with any intent so to do, since the decree itself enjoins mergers which have that effect.
(b) Effect as Restraining Commerce. Before examining the evidence to ascertain whether such "restraint" is here shown to result from the merger, it is necessary to define, as nearly as may be, the character and extent of restraint required to constitute a violation of the decree. As said above in connection with construction of the decree, the restraint intended therein is such restraint as would violate, or tend to violate, the act. Not every restraint of commerce is within the act. Hence the necessity of stating and approaching the evidence with a conception of the standard or measuring stick of what is *297 to be regarded as restraint forbidden by the act.
The evils sought to be averted by the act are those which spring from monopoly. Competition is the antithesis of monopoly. In a sense, any elimination of competition is a movement in the general direction of monopoly. But competition is, in its very essence, a contest for trade, and any progress or victory in such contest must lessen competition. Competition must always bear in itself the seed of its own alteration or even destruction. Success in business is ordinarily success in competition, and such success is a usual incentive to business effort, and is, of itself, commendable. It is only when this lessening is with an unlawful purpose or by unlawful means, or when it proceeds to the point where it is or is threatening to become a menace to the public, that it is declared unlawful. At that point the public protects itself. The point of danger is reached when monopoly is threatened.[3] This threat or monopoly exists, irrespective of intent, whenever competition is lessened to the danger point. The Supreme Court has construed the purpose of the act to be to prevent monopoly by preserving that character and degree of competition which will prevent monopoly  to be accomplished by preventing the destruction or menacing of such competition. This has been variously expressed as "undue" restraint or "unreasonable" restraint of trade or of commerce. When a restraint is "undue" or "unreasonable" is, of course, dependent upon the facts of each particular case, and requires the application of sound judicial common sense as to existing conditions and as to evident or probable results, and cannot be defined except generally. However, that court has said that restraints are "undue" or "unreasonable" when *298 they have "a monopolistic tendency" (Standard Oil Co. v. U. S., 221 U. S. 1, 62, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), or "prejudice the public interests" (Nash v. U. S., 229 U. S. 373, 376, 33 S. Ct. 780, 57 L. Ed. 1232), or "injuriously affect the public" (International Shoe Co. v. Federal Trade Comm., 280 U. S. 291, 298, 50 S. Ct. 89, 74 L. Ed. 431), or carry power to "suppress competition" (U. S. v. Amer. Linseed Oil Co., 262 U. S. 371, 389, 390, 43 S. Ct. 607, 67 L. Ed. 1035; Eastern States Lumber Ass'n v. U. S., 234 U. S. 600, 610, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; U. S. v. Amer. Tobacco Co., 221 U. S. 106, 179, 31 S. Ct. 632, 55 L. Ed. 663; U. S. v. Union Pac. R. R. Co., 226 U. S. 61, 85, 88, 33 S. Ct. 53, 57 L. Ed. 124), or to keep others from entering the business (U. S. v. Terminal Railroad Ass'n of St. Louis, 224 U. S. 383, 393, 32 S. Ct. 507, 56 L. Ed. 810). When these various expressions are considered, as they should be, along with repeated expressions that normal business development and growth is not impeded by the statute,[4] even though it be by combination,[5] it is clear that "undue" or "unreasonable" restraints are such as have a direct, natural, and evident tendency to create monopoly  that is, monopoly (or the power to monopolize) may be expected to result therefrom. This idea has been succinctly expressed by Mr. Justice Holmes as, "a combination in unreasonable restraint of trade imports an attempt to override normal market conditions." American Column Co. v. U. S., 257 U. S. 377, 412, 42 S. Ct. 114, 121, 66 L. Ed. 284, 21 A. L. R. 1093. When this main case was in the Supreme Court, the Chief Justice defined undue restraint of trade as being synonymous with "the acts which produce the same result as monopoly." 221 U. S. 1, 61, 31 S. Ct. 502, 516, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734. Therefore, the legal standard or measuring stick which we are to apply to the facts is whether this merger will tend to create monopoly or the harmful results thereof because of its effect upon existing and probable competitive conditions in the industry.

2. The Facts.
It is conceded and is obvious that whatever competition now exists or would probably arise between these two companies will be entirely eliminated by this merger. Therefore, our examination of the evidence is (a) to ascertain the character and extent of such competition, and, therefrom, (b) to determine the effect upon the industry of the elimination thereof by the merger.

(a) Character and Extent of Intercompany Competition.
Broadly speaking, both companies are engaged in the manufacture and sale of petroleum products. However, there are numerous products of petroleum. The basis of all such products is crude oil taken from wells. From this many different things are made in the course of the refinement and treatment of the crude oil. The evidence justified the classification of these products (made by the parties) into (1) gasoline, (2) kerosene, (3) lubricants, (4) fuel, diesel, gas, and furnace oils, and (5) miscellaneous products. It is important to observe this classification since it will be repeatedly referred to hereinafter. The chemical constituents of the crude oil, the methods of refinement, the quantity of production (crude and resulting refined), and the public demand seem the factors determining the production and marketing problems which have developed the character of the industry.
Our immediate concern is with the situation now  the time of the contemplated merger[6]  yet that situation is hardly understandable without a knowledge of certain progressive developments in the petroleum industry which have brought about the present situation therein nor without a brief history of these two companies.
The value of petroleum is in the products manufactured from it. In the earlier stages of the industry, the most valuable product was kerosene, which was used for illuminating *299 purposes. Another important line of products was lubricants. The range of lubricants became increasingly wide to meet the varied requirements of machinery lubrication  ranging from the coarse heavy axle greases to the fine oils required for delicate mechanisms. In those earlier days, there was little or no integration in the industry, and those who entered it devoted their attention to some particular line of products  the main divisions being kerosene and lubricants. The Vacuum appeared about this time. It entered the lubricant field, and therein did not attempt to cover the entire field of lubrication, but confined itself to the production of the higher grades of greases and oils. It sold its products direct to the dealer or to the user (usually factories).
The refining of crude (whatever the product mainly sought by the particular refiner) resulted in various substances, and investigation progressively developed numerous byproducts of value. A natural business need was to develop markets for the various products and by-products. Among these by-products was gasoline (then called naphtha). Uses for gasoline were developed in household stoves and stationary engines, and it became, therefrom, important, though still less so than kerosene or lubricants. Then came the automobile. This machine depended upon gasoline for its motive force, and required much lubrication of various moving parts. The introduction of electricity as a light medium affected the use of kerosene. These two forces revolutionized the petroleum industry. Rather rapidly, gasoline passed from an important by-product and became the most desired product; kerosene sank in relative use and importance, and a new, widespread, and increasing use for certain kinds of lubricants occurred. Another important development was the use of oil as fuel  at first this use was of such crude as did not profitably yield to known refining methods; later, when refining methods improved, it was of a refinery residuum product.
The development in the industry was not confined to changes in consumers' use of products and in methods of production. Problems of refinery supply and of transportation gave rise to pipe lines, tank cars, and vast storage facilities. The lessening or exhaustion of production in old crude fields and the discovery of new fields in other parts of the country presented difficulties to be overcome. These and various other considerations suggested the business advisability  if not necessity  of integration in the industry. The old Standard Oil combination was such an integrated business. It brought together, under one management, refineries (of all manner of petroleum products  kerosene, lubricants, and all kinds of by-products), pipe lines, tank cars, and tank ships. Among the companies so absorbed was Vacuum, which continued (as a unit in the combination instead of as an independent concern) to manufacture high-grade lubricants. The Standard went into the production of crude oil (although it remained a larger buyer thereof). Also it created an extensive and far-flung marketing organization for its various products. A feature of its marketing plan was to use marketing companies which confined their activities to certain designated territories. Socony was created as such a marketing agency for the territory of New York and New England.
At the time of the dissolution (1911), Vacuum had never (except as to domestic markets outlets) changed its character of business, and Socony was a marketing company subsidiary with small refining facilities and no pipe lines, tank cars, or crude production. The dissolution resulted in each becoming an independent entity which must do its own business. Vacuum continued much the same as before, except that it built up its own domestic market organization, until about 1926. Socony developed a rounded petroleum products business. This development of Socony was toward an integrated company, producing crude from which it made gasoline, kerosene, lubricants, etc. Such development was not complete in the sense of making all of the petroleum products which were derived from the crude, but it did cover the general range, and included the most important ones. Up to 1911, as the marketing agency of the old combination in New York and New England, it had established marketing facilities in that territory, and that naturally continued to be its principal field, although it established an important foreign trade in several lines  principally kerosene and gasoline.
Then there came certain influences which changed the conditions in the entire industry. The three predominating influences were continued, and enormous productions of crude, the rapid increase in automobiles, and the method of marketing gasoline and lubricants to automobile users. The great increase in crude production served to greatly build up several companies which had been independent when the old Standard Oil combination was dissolved and to bring into *300 the business many entirely new companies, some of which grew to considerable size. Many of these old and new companies were thoroughly integrated all the way from production of crude to the marketing of the various refined products. The inevitable tendency, in the search for markets, was to expand territorially, so that for some years past the more important of these companies have been selling in several states, some of them have developed a nation-wide business, and some have, in addition, an important foreign trade. For some years the crude production has kept ahead of the refining capacity and also of the existing consumption need, so that this search for markets has been rather intense on the part of all companies.
This overproduction of crude was both stimulated and relieved by the enormous increase in automobiles  particularly in this country. Such increase furnished by far the principal consumption of gasoline and a very important consumption of those classes of lubricants suited to automobiles. Automobile owners became the principal users of these important petroleum products. That was a trade most desirable to secure. Growing out of this situation, and to meet the needs and desires of the automobile trade, a new method of marketing developed. Before the advent of the automobile, the method of marketing petroleum products varied somewhat with the character of the product and the character of the usage. As to many products, the sale was to the retailer. As to kerosene and gasoline, the old Standard Oil combination had partially developed a tank wagon trade direct with household consumers. In lubricants there was direct sale to large consumers, such as factories and railroads. This was about as far as direct contact with the consumer had developed. Also there was little consumption of more than one product by any important class of consumers. However, the automobile presented a very important class of consumers who used both gasoline and lubricants  the individual purchases being in relatively small quantities. In the initial stages, both of these products were furnished almost entirely by independent retailers, and such dealer might have either or both to offer the automobile customer. It was not unusual for such customer to get gasoline at one place and oil at another. The struggle for this trade made the pleasure of that customer worthwhile, and such pleasure and convenience soon directed that he be able to procure oil at the same place and time that he bought gasoline, and that distances be not too great between the places where he could procure them. A factor which aided this development was that, for the most part, the companies which made gasoline also made automobile lubricants, and the natural thing was to press the entire automobile line upon the retailer. The final step in this matter is that the refining companies have widely, rapidly, and increasingly established their own retail stations ("filling stations"), at which they handle only gasoline and oils of their own manufacture. At present, this retail distribution is in the hands of independent retailers (such as garages and filling stations) and of company owned or controlled stations, with a pronounced tendency to carry a unified line by the independents, and with a decided tendency toward expansion of the company owned or controlled stations where only the products of the particular company are offered. Aside from automobiles, there is the same tendency to sell all lines of products to the consumer  such, for example, as fuel oil and lubricants to railroads and to steamship lines.
Another influence is that the companies have almost universally adopted trade-names for their products  particularly those for automobile use. Extensive, nation-wide advertising has taken place, with the design and result of creating a demand in the individual automobilist for a particular brand of gasoline or oil or both. As the range and use of the automobile is nation-wide, the fullest value from such advertising is secured by the widest territorial distribution of such brands.
To summarize. The present state of the industry is that of integrated companies having an ownership of crude, refining capacity (producing gasoline, lubricants, and other petroleum products), selling to each retailer or to the consumer as near a complete line of products as the consumer uses. The unquestionable tendency is, as to a very important class of customers (owners of automobiles), to sell direct to the consumer and to sell both gasoline and oil at the same time and place.
We have not attempted to state the many influences which have shaped nor to trace  except in veriest outline  the course of development of the industry. It has seemed necessary to do no more than sketch the framework of a general situation of which these two companies are part, and by which they must inevitably be influenced, if not indeed governed. It is not of their making, *301 and is beyond their control. It is a business current which they cannot successfully oppose. It cannot be ignored in judging their actions and the results therefrom.
In approaching a description of the present business of these two companies, it is necessary to determine a controversy affecting one phase of it. The plaintiff objected to all evidence as to foreign business of either on the ground that it was immaterial as, it is said, the act does not govern foreign trade, and is not for the protection of outside peoples. We cannot agree. While, of course, the act is not designed to have an extraterritorial effect, yet that does not render this evidence immaterial. We do not judge violation of the decree by the effect of the merger upon foreign trade, but the business of each of these companies is a unit, and each has an important foreign trade as an integral part of that business. It is difficult to fully and properly understand the true present place of each of these companies as respects each other or in the industry or the effect of the merger upon domestic monopolistic tendency or the real motive inducing the merger, if we eliminate entirely this foreign trade. This is so because the industry is not a local nor even a national matter, but is world-wide; because there are various companies engaged in it, the trade of which is world-wide; because the tendency in the industry is to aspire to and to acquire world-wide trade; because the entire business and commercial power of these companies has a direct bearing upon the effect within this country to be expected from the merger, and because the reciprocal conditions of the foreign trade of these two companies are an important part of the reason advanced by them as showing that the merger is a natural, normal, and lawful business step. There is ample judicial precedent for considering such foreign trade in cases of this character. U. S. v. Sisal Sales Corp., 274 U. S. 268, 47 S. Ct. 592, 71 L. Ed. 1042; Geddes v. Anaconda Min. Co., 254 U. S. 590, 594, 595, 41 S. Ct. 209, 65 L. Ed. 425; U. S. v. U. S. Steel Corporation, 251 U. S. 417, 453, 457, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121.
Since the ultimate question of fact involved in this merger is its effect at this time and its probable future effect upon the industry, in its relation to the public, we think that the real effect of a merger of these businesses will be best understood by considering, first, the intercompany competition of the two companies, and, after the nature and extent of that competition is stated, to examine the effect, upon the general competitive conditions, of the elimination thereof by the merger.[7]
The first matter is as to (a 1) the resources and character of business of the two companies; next we shall consider (a 2) the character and extent of the actual and of the potential intercompany competition of these companies.

(a 1) Resources and Character of Business.
At the end of 1929, using round figures, Vacuum had a capitalization of $128,499,000; a capital surplus of $4,769,000; and a surplus of $52,471,000. It had assets of $205,724,000, included therein being stock in foreign Vacuum companies ($57,100,000), real estate  plant  equipment ($36,241,000), merchandise  material ($53,732,000) and cash  securities ($18,431,000). Its net profits for that year were $36,767,000. Socony had a capitalization of $434,489,000; a surplus of $111,770,000; and an "insurance reserve" of $8,258,000. It had assets of $708,406,000, included therein being real estate  plant  equipment ($468,826,000), merchandise  materials ($226,910,000) and cash  securities. ($8,003,000).
Since its beginning (more than sixty years ago), the business of Vacuum has been and is the manufacture of high-grade lubricants (lubrication specialties) from crude petroleum for all manner of industrial, marine, and automobile uses. Its prime purpose has been and is to make lubricants particularly suitable to various actual lubricating needs. Its general method is, through its organization of lubrication experts, to study *302 the actual working conditions surrounding particular classes of machines, and therefrom to determine the character and composition of lubricant best suited thereto; then to ascertain the kind of crude oil most suitable, and to design a process whereby a lubricant with the desired qualities can be produced.[8] While this is the main purpose of the Vacuum business, the conditions present in refining crude petroleum to make such lubricants and the necessities of situations surrounding the marketing of such lubricants cause it to sell petroleum products other than these high-grade lubricants. The refining conditions are that the crude cannot be entirely converted into such or any lubricants, but, in the process of refining for lubricants, various other valuable products are necessarily or easily produced which are in the nature of by products to its main purpose  such are gasoline, kerosene, fuel, diesel, and furnace oils, and a great variety of miscellaneous things (as wax, candles, paraffin, asphalt, road oils, etc.). These by-products, so resulting from the manufacture of its lubricants, are commercially valuable, and therefore form a subsidiary feature of Vacuum business. The business situation is illustrated by the advisability of furnishing the full line of lubricants to a customer where part of his needs are of lower grade lubricants than those made by Vacuum.[9] Until the advent of the automobile, these high-grade lubricants made by Vacuum were mainly for industrial, marine, and other machinery. Since high-grade lubricants were peculiarly fitted to situations where the lubricant was confined and used for repeated lubrication, and since the automobile presented this situation, Vacuum early entered into that field. While its other lubricants still form the larger part of its business, yet automobile lubricants have become a very important feature  particularly in the United States, where there is general and wide use of the automobile.
The above character of business determined the relation of Vacuum to the different steps in the manufacture and sale of petroleum products. As a feature of its method was the use of selected crudes for its own manufacture, it purchased from various producers those crudes best suited to its immediate purposes. This policy was pursued until 1923, when it produced (in conjunction with another company) a small amount of crude. Since that time its production has grown to about 10 per cent. of the amount used by it in its refining.[10]
To manufacture its lubricants, Vacuum has three refineries and one "skimming plant" in the United States and five refineries and one "topping plant" in Europe, with a total daily capacity of 35,100 barrels (42 gallons).[11]
In addition to the products manufactured by it, Vacuum buys various petroleum products for resale (principally abroad). Thus its sales consist of its own and of its purchased products.
It markets its lubricants in every state in this country and in every important country in the world except Russia. Of its total business, 66.7 per cent. is in foreign countries, where it sells 64.3 per cent. of the gasoline distributed by it, 96.4 per cent. of the kerosene, 62.5 per cent. of the lubricants, 26.7 per cent. of the fuel, diesel, and furnace oils, and 57.2 per cent. of the miscellaneous products. In conjunction with its foreign trade in lubricants, it makes considerable sales of gasoline and kerosene in many European countries, Australasia, and the principal markets of Asia and Africa. Of its total profits (in *303 1929) of $36,767,627.75, all except about $4,200,000 came from its foreign business.[12]
In the United States the situation is as follows: It sells lubricants in every state; its sales of kerosene, fuel, diesel, and furnace oils and miscellaneous products have been local (to the refineries), usually sporadic and relatively trivial  merely the disposition of accumulations at the refineries without any sustained selling or distribution facilities; its sales of gasoline were, until 1926, wholesale to other companies (of which Socony was one).
Its marketing methods and organization have been shaped to meet the various conditions surrounding the selling of its high-grade lubricants. While it was a part of the old Standard Oil combination, it had its own foreign selling organization, and, in the United States, its products were distributed through the various Standard Oil selling agencies (including Socony). After the dissolution in 1911, it built up its own selling plans and organization in this country. As it accentuated its ability to furnish lubrication "service" as superior to merely furnishing lubricants, it made surveys of the lubrication needs of industrial plants, railroads, et sim, and sold to such industrial consumers direct. Also, it sold wholesale to dealers in lubricants. Until 1926, the latter method was employed in selling automobile lubricants  it placed such lubricants with garage and filling station owners and other dealers, and had no direct touch with the automobile owner. By that year the tendency of integrated companies to market their brands both of gasoline and of automobile lubricants to the same retail dealer or through their own filling stations, the expansion of such marketing methods by the absorption of existing independent retail agencies or by extended installation of stations owned or controlled by such companies  at both of which usually only their own lubricants were sold  and the habit of the automobile owner to purchase such lubricants at the same time and place as he bought gasoline, began to be seriously felt by Vacuum.[13] To meet this change in marketing conditions of its automobile lubricants in the United States, Vacuum began, in 1926, to acquire control or ownership of filling stations and other outlets where such lubricants could be offered in connection with its own brand of gasoline, and, instead of selling its gasoline wholesale to other companies as theretofore, to dispose of it through these acquired retail stations and outlets. Since that time it has expended about $36,000,000 in the purchase of such, and has obligated itself for other agencies having about 62 stations and 54 dealers. Such acquisitions are in Western New York, Pennsylvania, Ohio, Eastern Missouri (in and near St. Louis, with a few stations near the Mississippi river north of St. Louis), and relatively small areas in Michigan, Wisconsin, Indiana, Illinois, Iowa, Minnesota.[14] For the most part, these marketing acquisitions are in territories contiguous to its refineries.[15] These now acquired agencies about exhaust the gasoline produced at the Vacuum refineries in the United States. The preceding is a general outline of the present character and extent of the business of Vacuum.
*304 A feature of the old Standard Oil combination was the division of the United States into selling territories and the placing of each territory in the exclusive control of an agency. Socony was organized as such an agency for New York and the New England States. At the dissolution in 1911, that was its character. At that time it had an extensive selling and distribution organization and facilities in that territory. It had no crude production and only a small refining capacity (about 20,000 barrels daily). Since then it has developed along the line of an integrated company. Now it has a large actual and potential crude production in California, Oklahoma, Texas, and (to a less extent) Louisiana, and it has prospective production in Mesopotamia. Excluding Mesopotamia, the proven acreage is 208,000 acres, and the undeveloped is 3,673,000 acres. In 1929, Socony production from its owned or leased acreage was about 45,700,000 barrels (of 50 gallons each). It has sixteen refineries in the United States, with a total daily capacity of 227,500 barrels (42 gallons each) located in Caliornia, Kansas, New York, Texas, Wyoming, and Rhode Island.[16] At these refineries, in 1929, it ran 52,500,000 barrels in the manufacture of all manner of petroleum products. It refines about 75 per cent. of the products it distributes in the United States and abroad. It purchases crude and also various refined products which latter it resells. In 1929 it sold 69,343,494 barrels of all kinds of petroleum products, of which 57,379,507 barrels were sold in the United States and 11,963,987 barrels in foreign countries.[17]
Socony markets its products in the United States and abroad. Abroad, its business is mainly confined to Asiatic and Asia Minor countries and places. In Europe it has no business except in Jugo-Slavia, Bulgaria, Greece, and Turkey. In Africa, it has small sales of lubricants in South Africa and substantial sales of fuel, diesel, and gas oils in Egypt and the Sudan. In South American countries it sells only a small amount of fuel, diesel, and gas oils (1,954 barrels). It has practically no business in other foreign countries. Although it sells all classes of its products in China, Japan, Dutch East Indies, Straits Settlements, Bulgaria, Syria (including Cyprus and Cilicia), Greece, Turkey, and Jugo-Slavia and practically all in Indo-China, Siam, Philippines, India, and Ceylon, there is a wide variance in quantities of various classes of such products sold in these different countries.
In the United States, it sells gasoline in thirty-one states, but such sales are trivial in four of such states (Nevada, Utah, Pennsylvania, and Ohio), and are less than 100,000 barrels in six others (Arizona, Iowa, Missouri, Montana, Wisconsin, and Wyoming). It sells kerosene in thirty-one states, but such sales are trivial in eighteen of such states (being less than 1,000 barrels in six, less than 5,000 barrels in six, and less than 20,000 barrels in six), and more than 100,000 barrels in only five states (New York, Connecticut, Massachusetts, Texas, and Kansas). It sells fuel, diesel, and gas oils in thirty-four states, but such sales are below 10,000 barrels in ten of such states and below 50,000 barrels in nine others. It sells lubricants in twenty-nine states, but the sales are below 5,000 barrels in twelve of such states. It sells miscellaneous products in twenty states, but, out of total sales of 1,955,564 barrels in such states, 1,823,494 barrels are sold in three states (New York, Massachusetts, and Texas).[18]
At the time of the dissolution of the old Standard Oil combination, Socony had a marketing organization and equipment suited to the then state of the industry and to the marketing methods then developed. This organization was confined to New York and the New England States. As a part of its subsequent development into a thoroughly integrated company, it extended its marketing system to keep abreast of the changes in the industry and in the marketing methods therein. Those methods naturally varied with the character of the products to be marketed. As the claimed competition  actual and potential  between the two *305 companies is (in the United States) almost entirely in lubricants and gasoline, the present marketing methods of Socony in those two products is all that need here concern us  though it may be said generally that marketing of other than automotive lubricants is by sales to dealers or large consumers. Marketing of automotive lubricants and gasoline is largely through locations (filling stations, etc.) owned or operated by the company or its subsidiaries and through retail dealers to whom such lubricants and gasoline are sold by it or its subsidiaries. As of March 24, 1930, Socony and its three subsidiaries (Magnolia Petroleum Company, General Petroleum Company, and White Eagle Oil Corporation) had a total, both of owned and operated and of dealers, of 37,077 outlets in 11,855 cities or towns in twenty-nine states.[19] The stations and dealers in New York and the New England States represent the development and expansion from the original business of Socony as a selling agent in that territory for the old combination. Those in other states came through acquirement of three subsidiaries which had existing established marketing facilities.
The above description of the character and extent of the businesses of Vacuum and Socony, while necessarily general in character, is sufficient to enable us to take up the matter of the competition between the two companies.

(a 2) Intercompany Competition.
First we will consider the actual existing competition, and, thereafter, the potential competition. In considering this intercompany competition, we will proceed along the line of narrowing down to those products and to those territories where there is real existing competition. First we will consider the foreign business and thereafter the situation in the United States  treating products and territories rather together as to each of these fields (foreign and domestic).
There is no foreign country in which both Socony and Vacuum sell all of the five classes of petroleum products.[20] There are but three countries in which both sell gasoline. Those countries with the amounts sold by each company therein are Syria (including Cyprus and Cilicia) Socony 54,410 barrels, Vacuum 64,247 barrels; Jugo-Slavia, Socony 84,042 barrels, Vacuum 28,994 barrels (refined for it by Socony); Canada, Socony 32,679 barrels, Vacuum 295 barrels. Both sell kerosene in only two countries  Syria (including Cyprus and Cilicia), Socony 56,639 barrels, Vacuum 57,817 barrels; and Jugo-Slavia, Socony 116,099 barrels, Vacuum 43,338 barrels (refined for it by Socony). Both sell fuel, diesel, and gas oils in only three countries  Jugo-Slavia, Socony 81,987 barrels, Vacuum 1,517 barrels; Cairo-Sudan-Palestine, Socony 553,256 barrels, Vacuum 67,983 barrels (supplied by Socony); and Canada, Socony 23,558 barrels, Vacuum 3,733 barrels. Both sell miscellaneous products in a dozen or more countries, but the total sales of Vacuum in all except two countries is only 624 barrels, while Socony sales in the same countries totals 358,442 barrels. In the two above-excepted countries, the sales are South Africa, Socony 25,656 barrels, Vacuum 3,556 barrels; and Australia, Socony 1,121 barrels, and Vacuum 59,320 barrels. Both sell lubricants in eighteen countries.[21]
From the above it is clear that there are but two countries in which both sell most of the five classes of products  Syria (including Cyprus and Cilicia) and Jugo-Slavia  and in one of those (Jugo-Slavia) Socony refines for Vacuum the gasoline and kerosene it sells there; therefore, the only country where there is real competition in gasoline and kerosene is Syria (including Cyprus and Cilicia); that the only place where both sell fuel, diesel, and gas oils in appreciable quantities *306 is Cairo-Sudan-Palestine, and Socony there supplies what Vacuum sells; that, as to miscellaneous products, both sell appreciable quantities only in two countries (South Africa and Australia), in the former of which Vacuum sells but 3,556 barrels, while in the latter Socony sells but 1,121 barrels. Thus it is evident that, as to gasoline, kerosene, fuel, etc., oils and miscellaneous products, the competition between these two companies abroad is relatively inconseqential. The status as to lubricants requires some further examination to understand the actual situation.
These companies sold respective totals in eighteen countries of 680,207 barrels (Socony) and 639,349 barrels (Vacuum) of lubricants. However, "lubricants" is a broad term covering many kinds of lubricants for very different and various uses. Hence it does not necessarily follow that two companies which are selling "lubricants" in the same country or even in the same market are in competition  they may be selling entirely different characters of lubricants to entirely different characters of customers. Therefore, it is material to ascertain the character of lubricants and of uses therefor represented by the figures just stated above. The lubricants sold by these companies in these countries are classified into fourteen "types."[22]
The above statements and footnotes as to the inter-company foreign competition lead to the general conclusion that there is practically no substantial existing competition except in nine type of lubricants, representing about two-thirds of the total foreign lubricants sales of each, and that the force of such competition is affected as to several types in several countries by the facts set forth. Another consideration may be stated in this connection. We have taken the trade in each country in which both do the same character of business as competitive, although there is no evidence as to whether such sales were in the same market areas of such country. Some of such countries are rather large in area, and, if the sales by the two companies were not in the same markets therein, this would affect the actual competition.
Just before passing to a consideration of the United States intercompany competition, it is pertinent to state the relative proportions of the domestic to the foreign business and the total domestic sales of each class of products. The business of Socony is 80.8 per cent. domestic and 19.2 per cent. foreign. The business of Vacuum is 33.3 per cent. domestic and 66.7 foreign. In the five classes of petroleum products, the domestic and foreign sales percentages of each are as follows:

 Socony Vacuum
 Domestic Foreign Domestic Foreign
 Gasoline ............ 91.2 8.8 35.7 64.3
 Kerosene ............ 28.8 71.2 3.6 96.4
 Lubricants (incl.
 grease) ............ 61.4 38.6 37.5 62.5
 Fuel, Diesel, Gas
 and Furnace
 Oils ............... 87.1 12.9 73.3 26.7
 Miscellaneous ....... 81.4 18.6 42.8 57.2

(Socony foreign includes exports on account of others also.)
*307 The total of domestic sales, by-products, is as follows:

 Socony Vacuum
 Gasoline ........... 26,050,002 barrels 2,498,025 barrels
 Kerosene ........... 2,450,995 barrels 100,829 barrels
 Fuel, Diesel, Gas
 and Furnace
 Oils ............. 25,683,589 barrels 899,635 barrels
 Lubricants ......... 1,221,856 barrels 1,302,732 barrels
 Miscellaneous ...... 1,973,065 barrels 82,081 barrels
 __________ _________
 Total .............. 57,379,507 barrels 4,884,302 barrels

We come now to examination of the existing intercompany competition in the United States. As in consideration of the same character of foreign competition, this examination involves the matters of products and territories.[23] As to gasoline, both companies sell in nine states (New York, Massachusetts, Vermont, Iowa, Minnesota, Missouri, Wisconsin, Ohio, and Pennsylvania). In those states, Socony sells a total of 14,382,855 barrels and Vacuum a total of 2,249,989 barrels.[24] Study of the tabulation in the note shows that both companies market substantial quantities in only four states (New York, Iowa, Missouri, and Wisconsin). In Missouri, the sales by Socony are entirely in the western part of the state through its subsidiary, the White Eagle Company, while those by Vacuum are entirely in or near St. Louis from its "skimming" plant in East St. Louis  these selling fields, about 250 miles apart, can hardly be competitive in any substantial sense. In Iowa, Vacuum has 5 service stations in 5 places, and 18 dealer outlets in 16 places, while Socony has 12 stations in 9 places, and 52 dealers in 42 places  the evidence does not show the location of these places, and it is therefore impossible to know to what extent they are in real competition. In Wisconsin, Socony has 42 stations in 32 places and 92 dealers in 69 places, while Vacuum has 63 stations in 48 places and 123 dealers in 85 places  as in the case of Iowa, the evidence does not show the locations of these stations and dealers, so that the extent of this competition is not shown. In New York, Socony has 3,272 stations in 1,415 places and 8,284 dealers in 1,667 places, while Vacuum has 46 stations in 24 places and 88 dealers in 29 places. The evidence shows that Socony covers the state very generally, and that Vacuum covers the western and central parts of the state, with a considerable representation along the principal highways in other parts of the state. The situation as to competition in gasoline may be summarized as follows: There is actual competition in New York, particularly in the western and central portions; whether there is competition in Iowa and Wisconsin is uncertain; there is no other substantial competition.
As to kerosene, both sell kerosene in ten states (New York, Connecticut, Massachusetts, Vermont, New Hampshire, Maine, Iowa, Missouri, New Jersey, and Pennsylvania). In only three states (New York, Iowa, and Missouri) do both sell substantial quantities. In Missouri, Socony sells entirely in the western part of the state, and Vacuum entirely in the eastern portion  there is no competition in Missouri. Whether the sales in Iowa and in New York are in the same marketing territories is not shown by the evidence. The probability is that such is true in New York. The evidence is clear that Vacuum makes no effort to establish a market for kerosene and has no distribution organization therefor. Its sales thereof are sporadic and largely merely to dispose of the accumulations of kerosene as a necessary by-product of and at its refineries. The competition therein with Socony is inconsequential.
As to fuel, diesel, gas, and furnace oils, both sell in seven states (New York, New Hampshire, Missouri, Indiana, New Jersey, Ohio, and Pennsylvania). Both sell substantial quantities only in five states (New York, Missouri, Indiana, New Jersey, and Pennsylvania). In Missouri, Socony sells in the western section and Vacuum in the eastern. Whether both enter the same market territory in the other four states is not shown. However, there is evidence that sales by Vacuum in New York and the Eastern States are merely incidental to the running of crude for lubricants, are irregular, and are confined to a few large purchasers, with no household trade.
As to miscellaneous products, both sell in eight states (New York, Connecticut, Massachusetts, New Hampshire, Maine, Louisiana, New Jersey, and Pennsylvania) but substantial quantities only in New York and Pennsylvania. In New York, Socony sells 957,126 barrels, Vacuum, 7,796 barrels; in Pennsylvania, *308 Socony, 2,100 barrels, Vacuum, 12,501 barrels. The evidence is that, because it refines selected crudes, the quantity of Vacuum production of miscellaneous products is small.
As to lubricants (of all kinds), the two sell in every one of the twenty-nine states where Socony markets lubricants  Vacuum selling in each of the United States. In Utah and Nevada, the sales by Socony are negligible (Utah, 62 barrels and Nevada 424 barrels). While there is no evidence as to meeting in the same markets in these states, yet it seems fairly inferable from the character of the product and the business distribution methods of Vacuum that there is competition in these states in so far as location of markets is concerned. As to lubricating oils other than automobiles, there is some further light in the evidence. As to New York and New England there is substantial selling by both in only three classes (other cylinder oils, high-grade specialty machine and engine oils, and other machine and engine oils) out of eleven classes of such oils;[25] Socony sells no transformer, tanners, gargoyle, and practically no marine oils or high-grade specialty oil, while Vacuum sells no mineral seal, torch, signal, and absorbent, or base oils and practically no process, thread cutting, quenching, and soluble oils or sundries. As to the "Southwest" (Texas, Oklahoma, Arkansas, Louisiana, and New Mexico), Socony sells only two classes of such oils (other cylinder oils and other machine and engine oils), and Vacuum sells practically no other cylinder oils (366 barrels), and a relatively small amount of other machine and engine oils (1,851 barrels). As to all other states, both sell only marine oils, of which Socony sells a comparatively small amount (781 barrels); the Vacuum sales being 15,051 barrels.
As to automobile lubricants, the character of the product and the marketing methods of each company induce the assumption that there is competition, varying rather widely in character of product and extent of sales, in each of the twenty-nine states. An examination of Government Exhibit 1C[26] shows the tendency of Vacuum toward Premium Motor Oils and of Socony toward other motor oils  of its total sales of both classes in competitive states (380,627 barrels), Vacuum sold 360,073 barrels, or 94.6 per cent., of Premium; while, of its total sales of both in such territory (571,104 barrels), Socony sold 429,956 barrels, or 75.2 per cent., of other motor oils; also of total sales in such states by both companies of Premium motor oils (521,776 barrels) Vacuum sold 380,627 barrels, or 72.9 per cent., while of such total sales of Other Motor Oils (450,510 barrels) *309 Socony sold 429,956 barrels, or 95.6 per cent. The companies contend that there is no real competition in automobile oils because Vacuum specializes in Premium oils. The above figures show that this specialization affects the competition, but that it does not prevent or control it. In the first place, both sell Premium oils; in the second, Premium and other motor oils are both used for the same purpose, and the difference in cost is very slight (five or ten cents a quart), so that the competition exists, though in lessened degree.
Generalizing the result of the above description as to the various petroleum products, it is fair to say that there is little real existing substantial intercompany competition (in the United States) shown in three (kerosene; fuel, diesel, gas, and furnace oils and miscellaneous products) of the five classes of petroleum products. As to the other two products (gasoline and lubricants), there is active competition in Western and Central New York, and, to some degree, in other parts of New York in gasoline; there is competition of varying intensity in automobile lubricants in every state (twenty-nine states), where Socony sells such, and there is substantial competition in three types of industrial oils in New York and New England, and, to a less degree, in one type of industrial oils in the "Southwest." This is the existing competition which will disappear through the merger.
In most cases of this character, the discussion of intercompany competition may well be confined to the actual existing competition, and future  "potential"  competition may be passed over with the thought that it will follow normal lines of business development. In this case, however, there is an unusual situation affecting this future competition which will very probably influence the development of these two businesses. The situation, in this regard, should be examined in order that the entire competitive status as between these two companies may be thoroughly understood. This feature is the rather pressing urge for expansion of the business. The reasons for this urge are somewhat different as to the two companies, and the necessity therefor differs in degree.
The industry, as a whole, is thoroughly into the stage of integrated companies, which means that such a company owns or controls crude production, pipe lines, and tank cars, refineries to work up the crude and marketing organizations to sell the refined products  with special emphasis, as to marketing, upon the operation or control of retail automobile outlets. The superior business position of such an integrated company is evident. Among these advantages are the ability to make up temporary losses in one stage of the business by profits in another; to be independent of outside supplies and operations; to have a consistently sustained business; and to secure the ultimate profits of the entire business from the raw production all the way to the retail of the finished products. There are quite a few integrated companies, and the whole tendency of the industry is in that direction. It is this situation which is the main motivating cause of this merger.
*310 As to Socony  Socony is an integrated company with crude production (actual and potential) beyond the needs of its present refining and marketing facilities. If these latter two could be expanded, its business would be increased. Refineries are easily built by a financially strong concern. The more difficult and the more expensive matter is establishment or procurement of marketing outlets. Socony is financially strong enough to expand in a large way. This expansion as to markets can be either by establishment of new facilities or by purchase of existing facilities now operated by others. The growth of the industry has been such that the tendency is toward both, with accent probably on the latter method. This accent is shown by the purchase of its present subsidiaries by Socony, by the similar purchase of subsidiaries by Vacuum, and by such character of purchases by many other companies as shown in this evidence. As a rule, these purchases by these and other companies have been of established independent marketing organizations rather local in character, and situated in the territories whereinto the purchaser desired to expand. As shown above, the foreign business of these two companies, both as to territories and products, complements each other, and a merger would result in a much broader and stronger business situation for Socony abroad. In this country, the same is true, with the additional reason that in New York state Socony would not only enlarge its marketing outlets, but would be relieved of one competitor in a portion of the territory where it has many outlets. If the doing away with this local competition would result in a monopoly or a threat of such, that alone would be a serious objection, if not a sufficient bar, to the merger, but that is not true, because it is in that very area that Socony meets some of its keenest competition from many other companies. Another serious consideration is that Vacuum has a world-wide and long-established and widely advertised reputation for making high-grade lubricants, while Socony (although it makes some high grade lubricants) has never specialized therein, and has no such position in the business world. With Socony, the inducement is expansion.
As to Vacuum the situation is more urgent. The natural expansion (particularly of integrated companies) by purchase of existing marketing outlets and the decided tendency to exclude other gasolines and automobile lubricants from such outlets has positively reduced the retail outlets for such Vacuum lubricants in this country. In the last four years such loss has reached 19.2 per cent., and this loss is not entirely covered by amount because the absorption tendency is naturally and actually of the better character of outlets. This presents a decided menace to the sale of Vacuum automobile lubricants in this country. It is clear that it was to meet this situation and to protect its high-grade automobile lubricant business that Vacuum, about four years ago, began to acquire crude production and retail outlets where it retailed its gas (which it had formerly sold wholesale, as in the nature of a by-product of its lubricants manufacture). So far, its acquisition of crude fields is small, and it now has retail outlets for practically all of the gas coming from its refineries. Yet it has so spent about $36,000,000 in four years and incurred further substantial obligations for such purposes. When the above is considered in connection with the facts that the lubricant business of Vacuum extends into every state, that, so far, Vacuum has acquired outlets (owned or controlled) in only eight states, and not extensively in six of those, and that there is no reason to suppose the tendency of other companies to continue to acquire the most desirable outlets will in any wise diminish, it is clear that the position of the Vacuum automobile lubricant business in the United States is unsafe, and it is highly questionable whether the company can meet the situation quickly enough to avoid grave loss. Under present and clear future conditions, it must have retail outlets at which gasoline as well as its lubricants can be furnished. It must try to cover the United States, in a business sense. It must acquire crude production and build refineries to produce gasoline, or it must purchase such crude or such gasoline. The tendency of the industry makes such purchases to support such a far-flung and extensive business decidedly dubious, if not perilous. The prime inducement moving Vacuum is not so much expansion but rather protection.
To summarize this "potential" competition, the condition is that there is no way of estimating it except to say that it is reasonably certain that Vacuum must continue its expansion as rapidly and as extensively as its resources will prudently permit. Where this expansion will take place and what competitors it will meet cannot be even guessed, because it is now selling all of its own output of gasoline, and gasoline is the key to such expansion. Socony will continue to expand.
From the above, it is clear that there are sound business reasons for this merger which *311 are entirely sufficient and are wholly unconnected with any design to create a monopoly. Where there are such reasons and no design (as here) to create a monopoly or to proceed toward monopoly thereby, such merger is not forbidden, unless it naturally results in monopoly or the serious threat of monopoly. Whether such results are probable depends upon the entire related business situation. That situation is much broader than these two companies, and requires examination.

(b) Effect upon the Industry of the Merger.
While the "Petroleum Industry" is worldwide, we are interested in this large view only as it relates to the matter now in hand, and that relation can be rather briefly stated  it has to do with present and prospective competitive conditions in this country. However, it is not out of place to state that there are large and somewhat scattered foreign crude deposits from which there was a production, in 1929, of nearly 45 per cent. as much crude oil as in the United States and foreign refining capacity of about half that of this country.
The first immediate matter to be noted is that a foreign company (Royal Dutch Shell and subsidiaries) with vast resources has entered the United States and is developing and extending its business very rapidly. An idea of the importance of this company may be had from the fact that, in 1929, it produced 229,379,000 barrels of crude  something over 15 per cent.  in a total world production from all sources of 1,488,604,000 barrels. The second matter to be noted is that of an increasing importation of gasoline (coming mainly from Venezuela where the Shell company has extensive crude and refining facilities). Another matter is the relatively small percentage of petroleum exports furnished by Socony and Vacuum.[27]
As to the United States, the situation is as follows. The percentages of combined Socony and Vacuum of the entire production in the United States is as follows: Crude, 4.5 per cent.; refining capacity, 7 per cent.; gasoline, 8.9 per cent.; kerosene, 8.5 per cent.; fuel, diesel, gas, and furnace oils, 7.3 per cent.; lubricants, 12.8 per cent.; miscellaneous, 7 per cent. Crude is produced in eighteen states with Socony having production in four states, in two of which (Louisiana and Texas) Vacuum has a small production. There are 347 refineries in twenty-nine states, with Socony having 16 and Vacuum 4. The relative standing of these two companies (combined) with other large competitors as shown by the crude and refining statistics is as follows: Crude production (barrels) in the United States for 1929: Shell, 175,992,000; Texas, 120,000,000; Standard of New Jersey, 101,100,000; Gulf, 100,000,000; Standard of Indiana, 89,000,000; Socony and Vacuum combined, 57,986,392; Standard of California, 51,534,160; and eight other companies (Cities Service, Continental, Tidewater, Union, Pure, Sinclair, Richfield, and Phillips), ranging from 15 to 20,000,000. Daily refining capacity as follows: Standard of New Jersey, 718,100; Shell, 704,200; Standard of Indiana, 404,500; Socony and Vacuum combined, 263,600; Standard of California, 244,700; Texas, 232,800; and Gulf, 177,000. Another large company (Pan-American) which sells substantially in this country and in the New England area, has crude fields in Venezuela, Mexico, Texas, and Arkansas, and refineries in Venezuela, Mexico, Germany, and the United States; averages 70,000,000 barrels of crude annually; and has a daily refining capacity of about 100,000 barrels.[28] There are many other companies, of respectable size but smaller than those here named, which have fair crude production and refining capacity.
There are innumerable companies engaged in the petroleum business. Some are engaged in some particular part of the business (as crude producers, refiners, or marketers, etc.), while others are thoroughly integrated. Some are rather local, others extend into several states, some into all states. Defendants' Exhibit 138 is a chart showing the states in which "Twenty Important Companies doing a general petroleum business" market products, from which it appears that eighteen are in thirteen or more states, twelve in twenty or more states, eight in thirty or more states, five in more than forty states, and two (Texas Corporation and Royal Dutch Shell) in all of the states. Socony is in twenty-nine states, with all the way from six to fourteen of the above companies in every state in which it operates. From Defendants' Exhibit 8 (a chart showing percentage consumption of each of the five classes of products as sold by Socony, by Vacuum, and by other companies for 1929), it appears that, outside of the New England *312 States and New York, Socony sells 10 per cent. or more of any of the three important classes (gasoline, fuel oils, and lubricants) only in eight states.[29] Vacuum sells 10 per cent. or more of any of such three classes only in seven states, and in none of the above eight states in which Socony so sells.[30] Outside of New York and the New England States, the combined sales of Socony and Vacuum exceed 10 per cent. in any of these three products only in four states; such sales being of lubricants. From these figures it is clear that, while the merger will give the new concern more or less substantial footing in more states than either has at present, and will thus result in an expanded and complemented business, yet, volume of business considered, the situation is fairly confined to New York and the New England States. It is the situation in this territory to which the government largely confines its emphasis.
In that area, the merged business would, on basis of 1929 (Government's Exhibit 130), control as follows: Of all products, Socony, 23.8 per cent., Vacuum, .8 per cent., a total of 24.6 per cent made up in the five classes of products as follows: Gasoline, Socony, 33.7 per cent., Vacuum, 1.1 per cent., total, 34.8 per cent.; kerosene, Socony, 30.5 per cent., Vacuum, .3 per cent., total, 30.8 per cent.; fuel gas, etc., Socony, 14.8 per cent., Vacuum, .3 per cent., total, 15.1 per cent.; lubricants, Socony, 20.9 per cent., Vacuum, 7.7 per cent., total, 28.6 per cent.; miscellaneous, Socony, 27.6 per cent., Vacuum, .2 per cent., total, 27.8 per cent. From this it is clear that Vacuum additions in kerosene, fuel oils, and miscellaneous would be relatively trivial, of gasoline small, and substantial only in lubricants.
With this business status of the companies (separate and combined) stated, we pass to the matter of the competitive conditions in this territory in order to estimate the effect of the merger thereon. Defendants introduced an exhibit (No. 6) showing the percentage of consumption in this territory supplied by Socony in 1909 (the year of the decree herein) and of such percentages supplied by these companies (separate and combined) in 1929.[31] From this it appears that, whereas Socony supplied more than 90 per cent. of the total consumption of all petroleum products in this territory in 1909 (when it was the selling agency of the old combination), it now supplies 23.8 per cent., and the combined companies would supply only 24.6 per cent. This is true, although both Socony and Vacuum have been busy during this period in expanding their marketing agencies *313 in this territory.[32] In this territory, there are nine refineries, of which one is owned by Vacuum, four by Socony, and four by others  the combined capacity of those owned by these companies being 40,500 barrels, while the others have 44,200 barrels. In the adjacent states of Pennsylvania and New Jersey, there are fifty-four refineries, of which Vacuum owns one and Socony none  the capacity of the Vacuum refinery being 20,000 barrels, while that of the others is 515,500 barrels. This area, being on the seaboard, is readily and cheaply open to import products, particularly those of Shell, Pan-American, and others from Venezuela. This territory is thickly populated, and has offered an inviting field. Of the twenty companies doing a general petroleum business (Defendants' Exhibit 138), thirteen are in New York, Connecticut, and Massachusetts, eleven are in Rhode Island and Vermont, and ten are in Maine and New Hampshire. All of these companies are strong integrated concerns doing business in fifteen or more states, and include (in each of the above states) all of the five strongest companies (doing business in forty-one or more states). Beside these large companies, there are many smaller ones and a large number of independent marketing concerns.
Passing from this general survey of competitive conditions in this territory, the government introduced many witnesses as to conditions in their particular places or localities.[33] This testimony, almost without exception, was from witnesses who had entered into this territory since the decree (mostly within the last few years). It showed no difficulty in so entering and extending business therein. It showed practically all of the larger companies and a multitude of lesser concerns (many not integrated) engaged in an intensive and increasing competition in this entire area. It showed constant extension of business by the stronger companies. These and other witnesses showed this competition to be intense in lubricants (high as well as low grade) as well as in gasoline and other petroleum products. Also, that this territory is peculiarly vulnerable  in Western New York, from the adjacent Pennsylvania crude and refining industries largely controlled by other companies and, as to the remaining territory, from water-carried products from California and the Gulf States, Venezuela, Columbia, Trinidad, Mexico, Peru, and the Dutch West Indies (in which are large crude fields and refining industries owned by other companies, many of which are selling in New York and New England).
There are not only these potentialities of competition and these generalizations as to actual competitive conditions, but there is testimony as to the present strength in this territory of several individual companies. The government introduced an exhibit (No. 130) showing a "Comparative Analysis of Petroleum Products Sales in New York and *314 New England for the year 1929."[34] This exhibit covers sales of the five classes of products by Socony, Vacuum, and three others  large companies. As shown in this exhibit, the sales of these three other companies are very substantial as compared to Socony and Vacuum combined. But the exhibit is misleading, in that the testimony shows it *315 understates the sales of those companies.[35] Also, an examination of the testimony of many of the distributors and operators of stations (introduced by the government) who were scattered over this territory shows large sales of gasoline and lubricants produced by companies other than Socony or Vacuum. It is also shown that the strongest companies in the industry (Shell, Standard Oil of New Jersey, Gulf), as well as others which are outstanding (Cities Service, Tidewater, Sinclair and Richfield), are in this territory in a substantial manner and expanding therein.
The round situation is that, while Socony was formerly the thoroughly dominating concern in this territory, and while it still has more business and outlets than any other company therein, yet competition of all kinds and in all localities has entered and thriven, and is participated in by rivals amply able to take care of themselves, so that the most that can be said now is that Socony alone or Socony-Vacuum (somewhat more so) is the strongest single force in that area.
A point much stressed by the government is the alleged control of prices for gasoline, in this area, by Socony. It expressly disavows any contention of "price fixing," but contends that Socony rules the tank wagon and retail prices of gasoline, and that this is proof of its power in this area. This contention is confined to gasoline, as the only showing as to any other of the petroleum products is as to automobile oils, and such showing is that the prices are standard and not subject to fluctuation. Many witnesses were examined as to gasoline prices.[36] There is some seeming conflict in the oral testimony, but that may be largely accounted for by the differences of opportunities for and knowledge of the witnesses, and, in some instances, by the form of the questions answered. A form of question repeatedly put to the witnesses was whether they "followed" the prices posted by Socony, and most of them answered that they did. This form of question might carry the idea of compulsion, and that compulsion might arise from some power of Socony to enforce its prices and not from mere business reasons arising from natural competitive conditions. In many instances, it was developed what was meant by "follow," and in only two was the idea expressed of any coercive sense. In one of these, a station operator using Socony gasoline, who sold it under the regular price, testified that Socony agents had threatened to take away its pumps, "because I put in Red-hot gas [made by another company] and also because I reduced the price," but that it had done nothing and was still supplying him with gasoline, although he had continued to sell lower for months, and was still doing so. The other was of a station operator using Socony gasoline who thought he would lose this gasoline if he undersold, and would take a risk in trying to get gasoline from any other major company, as such "might tell you they haven't any gasoline to sell you; which has been done," and it was necessary to have a dependable sustained source of supply.
The exhibits (Defendants' Nos. 14 to 47g, inclusive) contain much valuable information as to the general competitive conditions as well as to prices in particular. These exhibits are letters and reports from field men or from handlers of Socony gasoline. They extend from in June, 1928, to in June, 1930, and are from localities in every state within this area. They show such a variety of competitive price conditions that it is difficult to generalize very far. They show such matters as the following: That in all of these places or localities there was serious underselling of the Socony retail prices by competitors; that there was some underselling wholesale to dealers; that this underselling was mostly by independently owned stations or independent retail dealers, but there was some underselling by stations operated by the larger integrated companies; that a substantial amount of the underselling was by retailers who handled gasoline purchased from the larger companies; that there were instances of retailers handling Socony or Vacuum gasoline who so understold; that underselling was sometimes very substantial (25 per cent. in the Buffalo district, 20 per cent. in the Rochester and Jamestown, N. Y., districts, for example); that it covered appreciable *316 areas (18 towns in the Oneida district and over 20 towns in the Utica district, for example); that there were appreciable price variations in nearby localities, caused by this underselling; that such underselling ranged to as much as five cents a gallon under Socony retail prices; that such had resulted in losses of business to Socony retailers; that Socony had been compelled to reduce its tank wagon and retail prices to prevent loss and to meet this competition.
The entire evidence seems to establish that, in the main, the wholesale and the retail prices of the major companies take the same changes at close to the same time. In many instances, these prices (if advances) are not followed by smaller refineries or by somewhat local distributors or retailers who more or less consistently undersold. Also, that "distress" gasoline (an overstock of some refiner) not infrequently comes into localities and temporarily affects price reduction therein. In the main, the prices are the same, but there is much selling at lower prices in many localities. The reasons for such uniformity as exists are not far to seek. The major companies (which are integrated companies) are selling in this area both as wholesalers and as retailers. They establish or recognize a certain price spread between tank car or tank wagon and retail prices  this spread seems to be six cents for tank car under retail and from two to four cents for tank wagon under retail price. Since they supply the bulk of wholesale gasoline to retailers, and since they themselves are retailing at a given price, and some of them are so retailing in every part of this area, the independent retailers who purchase wholesale from them (by car or wagon lots) cannot get business if they sell above the competitive retail price of these companies, and the price spread is so narrow as not to permit much profitable underselling of that price  as several witnesses expressed it, they could not sell at a higher price, and the spread allowed only a legitimate profit. Many of the retailers of gasoline procured from the small companies followed the local prices of the larger companies because they wish to make as much as they can, and do not desire to undersell. Thus it is evident that, with local exceptions (some temporary), the major companies fairly well control the situation. Because Socony is a financially strong integrated company, with substantial crude production and refining capacity, and because it is the largest single wholesale distributor and retailer in this area, with its retail stations more widely and generally placed than any other company, it has a distinct advantage in protection of the prices it may see fit to make if those prices are reductions. If they are increases, there seems no reason why other major companies or other distributors or retailers should follow, unless business reasons  aside from any idea of compulsion  suggest such be done. While there is sharp conflict in the evidence as to which company first makes changes in prices, it is evident that Socony could do so, and, if that change were a reduction, its competitors, generally speaking, would be compelled to follow that lead. But, even if it be taken that others, in this area, "follow" (in the above sense) the Socony prices, that is not governing, because there is no element of compulsion or attempt at compulsion present, although it is, as contended, proof of its business power in this area. The undisputed facts that competitors, large and small, have increasingly come into this area, extended and expanded their businesses freely, and are doing so with increasing force, completely negative any finding of an attempt at compulsory price control or any such result in the sense of the Anti-Trust Act. As an "evidence" of power, it is what would naturally be expected of a concern so situated as Socony in this area. Also it is to be noted that this position and this power have been, and are being, increasingly diminished. While it is not the subject of direct evidence, yet it is fairly inferable from the situation shown by the evidence that, if the major companies follow the Socony prices in this area, they do so because they do not wish to engage in a price-cutting war which might entail losses to all concerned (including Socony) without any compensating benefits. Such a view has no sinister aspect, but is merely a matter of business judgment and prudence illustrated in every community in the country by retail competitors in all lines. U. S. v. International Harvester Co., 274 U. S. 693, 708, 709, 47 S. Ct. 748, 71 L. Ed. 1302; Cement Mfrs.' Ass'n v. U. S., 268 U. S. 588, 606, 45 S. Ct. 586, 592, 69 L. Ed. 1104; American Column Co. v. U. S., 257 U. S. 377, 417, 418, 42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093; Geddes v. Anaconda Min. Co., 254 U. S. 590, 595, 41 S. Ct. 209, 65 L. Ed. 425; U. S. v. U. S. Steel Corp., 251 U. S. 417, 447, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121. Grocers, butchers, and all other lines in the same markets generally sell the same things at the same prices, for the sound reasons that they wish to get all they can, that they cannot get more than the price *317 at which the bulk of what is sold in their respective markets is selling, and that they do not think it wise to cut prices. As to gasoline control in this area, the merger would add to Socony 1.1 per cent. of the business therein  such addition being in New York and mainly in the western part of the state, which is peculiarly open to local competition from the production of the numerous Pennsylvania refineries owned by other companies.
As to the "potential" or probable future competitive condition in this area, it can only be said that the decided trend is toward an increase therein, and there is no reason to think that the relative position of Socony, or of the merger, will not grow less instead of greater. This territory is too inviting and too vulnerable to suppose that companies (large and small) will not continue to enter and expand or those already in will not continue expansion. The future, as to retailing, will probably be, as it seems to tend all over this country, to the displacement of the independent wholesaler and of the small independent filling station by stations owned, operated, or controlled by the major companies  all of them, not Socony-Vacuum alone.
The government argues that to hold this merger lawful will result in nullifying the effect of the main decree dissolving the old unlawful combination. It is not contended that this merger, of itself, will have such result, but the argument rather is that allowance of this merger will result in other of the parties to the old combination making mergers, so that, ultimately, the old combination will, in effect, be re-created. It is not claimed that the present merger is a step in pursuance of a plan to bring about such ultimate result, and the evidence is strongly that no such design exists. If it were present, this merger would be readily forbidden. The situation presented here is purely of two (of the thirty-eight corporate parties covered by the injunctive features of the decree) desiring to merge for reasons and purposes affecting them alone. What other of such defendants may do in the future is no part of this case. Any action they may take will and must be determined by the facts and circumstances which may then be present. There can be no doubt that the decree does forbid any of them from entering into arrangements to violate the act. When any of them attempt so to do, they will find the decree a very effectual bar. Such situations will be dealt with when they arise. We are and can be concerned only with what is properly before us.
It is urged, also, that this merger is merely an attempt to modify the decree in order to avoid the hardships resulting from changed conditions in the industry which have arisen since the decree, and that there was no reservation, in the decree, of any jurisdiction to modify or change the decree. No such reservation is in the decree. However, our examination and determination have nothing to do with modification of the decree, but solely with construction of the decree, as entered, and application of the decree, so construed, to the facts as shown in the evidence. We are not concerned with modification, by construction or otherwise.

III. Conclusion.
The results which we believe the evidence shows will follow from this merger are that the merged business will more rapidly expand at home and abroad; that it will be the third or fourth, in financial strength in this country; that it will be sixth in crude production and fourth or fifth in refining capacity; that it will not dominate nor approach domination of the industry in the United States or in the New York and New England area; that it will meet keen and effective and continued competition in every substantial market throughout this country from a number of concerns large and small  a few of which are stronger in every way than it will be, and many more of which are strong and formidable; that the present genuinely competitive condition in this industry in the United States will be really affected by the merger, principally in that it will be an additional competitor in states and localities where neither company is now substantially established; that it will protect and preserve the Vacuum market for automobile lubricants (which is now threatened); and that it may (like other companies), in the process of expansion, purchase and replace independent wholesalers and retailers who now operate in the localities into which it will expand.
Since it is not claimed and the evidence shows that such merger is not induced by any motive or purpose to monopolize commerce in petroleum products, as an entirety or in any locality, but by legitimate business reasons alone, and since the evidence convinces that the result of such merger as to such commerce will not carry power to "suppress competition" (U. S. v. Amer. Oil Co., 262 U. S. 371, 389, 390, 43 S. Ct. 607, 67 L. Ed. 1035; Eastern States Lumber Ass'n v. U. S., 234 U. S. 600, 610, 34 S. Ct. 951, 58 L. Ed. *318 1490, L. R. A. 1915A, 788; U. S. v. Amer. Tobacco Co., 221 U. S. 106, 179, 31 S. Ct. 632, 55 L. Ed. 663; U. S. v. Union Pac. R. R. Co., 226 U. S. 61, 85, 88, 33 S. Ct. 53, 57 L. Ed. 124), or to keep others from entering the business (U. S. v. Terminal Railroad Ass'n of St. Louis, 224 U. S. 383, 393, 32 S. Ct. 507, 56 L. Ed. 810), will not have a "monopolistic tendency" (Standard Oil Co. v. U. S., 221 U. S. 1, 62, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), will not "prejudice the public interests" (Nash v. U. S., 229 U. S. 373, 376, 33 S. Ct. 780, 57 L. Ed. 1232), nor "injuriously affect the public" (International Shoe Co. v. Federal Trade Comm., 280 U. S. 291, 298, 50 S. Ct. 89, 74 L. Ed. 431), will not have the result to, and is not an attempt to, "override normal market conditions" (American Column Co. v. U. S., 257 U. S. 377, 412, 42 S. Ct. 114, 121, 66 L. Ed. 284, 21 A. L. R. 1093), and will not "produce the same result as monopoly" (Standard Oil Co. v. U. S., 221 U. S. 1, 61, 31 S. Ct. 502, 516, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734), we conclude that it is not an "undue" or "unreasonable" restraint of interstate commerce within section 1 of the Sherman Anti-Trust Act (15 USCA § 1), nor a monopolization within section 2 (15 USCA § 2) thereof, and is therefore not in violation of that act. From this conclusion, it results that the merger is not within the inhibitions of section 6 of the decree, and therefore will not violate the decree.
The result is that, upon the merits, this supplemental petition must, for want of equity, be dismissed. The parties are given twenty days from the filing of this opinion to suggest findings of facts and conclusions of law in line herewith. Thereafter the court will file findings of fact and state conclusions of law and enter a decree dismissing the supplemental petition.
NOTES
[1] This is shown by the report of that case (221 U. S. 1, 12, 15-18, 31 S. Ct. 502). Mr. Johnson (page 12 of 221 U. S., 31 S. Ct. 502) urged that

"The sixth section of the decree is unwarranted and impracticable in various of its provisions."
Mr. Watson (pages 15-18 of 221 U. S., 31 S. Ct. 502) urged that the section did "without lawful authority so to do * * * restrict the distributees in the future sale, use and disposal of their stocks; restrict the distributees in the sale, use and disposal of their properties; and in the contract relations thereafter to exist, as well as the use and disposition of the different properties in such a drastic manner as to greatly injure and destroy the value of the same and render their future profitable use practically impossible. The decree disintegrates properties built with appellants' moneys for joint use so as to create units that never before existed and compels these units separately to carry on business and compete with other units, directly contrary to the purpose of their creation. It allows the future operation and use of the refineries, pipe lines, and other properties of the appellants only under the vague and indefinite, but broad and comprehensive, terms of § 6 of the decree, by subjecting those who in the future operate them to attachment for contempt for unwittingly violating vague and indefinite terms."
Further he contends (page 17 of 221 U. S., 31 S. Ct. 502) that:
"The decree follows the appellants and their properties after the dissolution.
"The Sherman Act closely limits and defines the power of the court on a petition filed to give equitable relief. The petition must pray that such violations shall be enjoined or otherwise prohibited; and it is these violations of the act that the court may now enjoin, and only such violations. Past unlawful competition does not deprive parties of their right to conduct lawful competition. New Haven R. R. Case, 200 U. S. 361, 404 [26 S. Ct. 272, 50 L. Ed. 515]."
And again (page 17 of 221 U. S., 31 S. Ct. 502) that:
"The effect of the decree is ruinous. For instance, these companies jointly own 54,616 miles of pipe lines, of which the seven individual defendants and their associates built over 50,000 miles, in which they have an investment of over $61,000,000.
"The decree splits up this pipe line system into eleven parts, takes away from the owners, who jointly built the pipe lines and who created the sub-companies, all control over the different sub-companies, and compels the eleven different parts to stand alone, independently of their principal and of each other, to be hostile to and to compete with their principal and with one another.
"Pipe lines are never parallel but always continuous, and each line has a value which depends wholly upon its connection with other parts of the system, and whether all are used together as one whole. The carrying out of the decree would cut the pipe line system into isolated segments, prevent such use, and make the successful operation of the pipe lines impossible."
[2] The supplemental petition outlined the decree, calling particular attention to section 6 thereof; sought to bring defendants within its provisions by allegations as to existing and potential intercompany competition; alleged the contemplated merger; and charged such merger would be a violation of the decree. Paragraph 5 alleges that each of the companies has "produced, purchased, manufactured, refined, transported, and sold a large and substantial part of the petroleum and its products produced, purchased, manufactured, refined, transported, and sold annually in the United States and especially in those several States thereof in which the principal part of the said trade and commerce of said companies is carried on." Paragraph 8 thereof charges that the elimination of intercompany competition will violate the decree.

The answer denies, generally, the allegations of paragraph 5, with an admission that the companies are engaged in the petroleum business in the United States and certain foreign countries in the sorts of products and in the areas set forth in paragraph 11 of the answer, and are potentially competitive in the sense that two companies engaged in different branches of the business might each in the future embark on a change in scope, character, and territorial location in a way to give rise to future competition. Paragraph 8 of the answer (which answers paragraph 8 of the petition) admits the merger will terminate the existing "fragmentary competition * * * in some types of products of each in some localities, as described in paragraph 11 of this answer" and will prevent any extension of future competition, but denies the merger will violate the decree. Paragraph 10 of the answer states defendants' construction of the decree as not forbidding them "to make normal and lawful contracts or agreements but as restraining them from by any device whatever recreating directly or indirectly the illegal combination which the decree dissolved," and states that the merger "is not for the purpose and will not have the effect either (1) of `continuing or carrying into further effect the combination adjudged illegal' by said decree and long since terminated by the operation thereof, or (2) of `entering into or performing any like combination or conspiracy the effect of which is or will be to restrain commerce in petroleum or its products among the states or in the territories or with foreign nations or to prolong the unlawful monopoly of such commerce' condemned by said decree."
Paragraph 11 sets forth the character and general locations of the business of each company and the place of each in the industry and the reasons (arising out of general conditions in the industry) for the merger. Under General Equity Rule 31 (28 USCA § 723) allegations of fact in the answer are deemed denied and become an issue of fact.
The situation created by the pleadings is that an issue of law is made as to the construction of the decree and an issue of fact as to violation of the decree as construed. The issue of fact tendered by the petition is whether these companies are "potentially competitive" within the meaning of section 6 of the decree  in short, are they the kind of parties prohibited from uniting under that section. The answer virtually, if not expressly, admits such "potential competition." But the answer tendered another issue of fact, arising from defendants' construction of the decree  that issue was whether the merger was for the purpose of, or would result in, "continuing or carrying into further effect the combination adjudged illegal," or would be an "entering into or performing any like combination or conspiracy the effect of which is or will be to restrain commerce in petroleum or its products among the States or in the Territories or with foreign nations or to prolong the unlawful monopoly of such commerce"  in short, whether the merger would violate the decree because it would violate the Anti-Trust Act. Obviously, which of these two questions of fact would need determination rested entirely upon the construction to be given the decree. It is clear that, if defendants' construction was determined to be correct, then the issue of fact presented in its answer was squarely presented as the then controlling issue which must be determined before the court could enter a decree in the case.
The situation which developed during the trial and presentation of the case on the above pleadings is as follows:
In a statement at the opening of the taking of evidence, Mr. O'Brian (R. 2) said: "As disclosed by the answer of the defendants, it is the theory of the defendants that it is incumbent upon the Government to show that the proposed transaction here sought to be enjoined would be in and of itself a violation of the Sherman Act. It is our theory that it is only incumbent upon the Government to establish that the proposed transaction falls within the terms of the decree and is a violation of the decree.
"The proof to be offered by Government concerns chiefly the allegations contained in sections 5 and 8 of the supplemental petition. The matters contained in the other allegations of the petition are either admitted in substance by the answer, or they are * * * covered by the record previously taken in the case [meaning the old record]. * * * The proof to be offered before you here, therefore, by the Government will concern chiefly the allegations of those two sections of the petition which deal with the question of the existing and potential competition between the Standard of New York and the Vacuum Company, and the effect which the petitioner asserts will flow from the transaction if it is carried out." (Italics ours.)
As to the Evidence. When defendants, on cross-examination, offered (Defendants Exhibit 11) to show the percentage of foreign consumption supplied by the two companies, Mr. Amen objected that it was "not within the issues of the case" (R. 33), and, upon suggestion by Mr. Dorr that the government had offered a complete statement of the foreign business of the two companies, this followed:
"Mr. Amen: I point out that the issue is raised in the defendants' answer. Therefore, it becomes necessary, to some extent, if the issue is to be raised, to have the data available for the consideration of the Court, should it in any way deem it material.
"Mr. Dorr: The Government has offered for the consideration of the Court a very detailed analysis of the business which these two companies are carrying on within foreign countries. The defendants conceive that they have the right to fully explain that situation to the Court." R. 54.
There was extended cross-examination by the government as to various of defendants' exhibits which related to the place of the companies in the industry as distinguished from any purely intercompany business. See R. 87-92, 93, 100, 114-126, 131-142, and other places. Also, respecting Defendants' Exhibit 142 (which was a map showing gross world-wide crude production of Shell, Socony, and Vacuum by countries), the following occurred (R. 133):
"Q. Now, referring to Defendants' Exhibit No. 142, what was your purpose in including the Royal Dutch Shell and associated companies in this chart in connection with Socony and Vacuum?
"Mr. Hocker: I object to that, if your Honor please, Mr. Dredger is simply a vehicle for presenting this exhibit. I don't understand that he exercised any purpose in connection with it. That was the purpose of the lawyers rather than the witness.
"Mr. Amen: Then I object to it. I want to find out  maybe I would not object if there was some logical reason for picking the Shell Company, which is not a party to this suit, to be used in connection with the symbols for the two companies which are parties to the suit 
"Mr. Dorr: This is merely prepared to prove an allegation in the answer.
"Mr. Amen: I am entitled to find out why the Shell Company, which is not a party to this suit, should be used on an exhibit including only Socony, Vacuum and Shell.
Mr. Dorr: If you will look at the answer you will see that it bears directly on the allegation in the answer.
"Mr. Amen: I have reasons for believing that the Royal Dutch Shell is used because it is the biggest company there is, and I want to find out if that is not the witness' idea. If it is not, then it is not. I cannot see any other reason for not picking any one of one hundred other companies.
"Mr. Dorr: If you will read the answer, you will." (Italics ours.)
In same connection (R. 134) occurred the following:
"Mr. Dorr: I will state for the record that there are allegations in the answer to the effect that in the world-wide business of Vacuum and the foreign business in Socony, that they meet a competitor which is world-wide in its scope and has production in each of the important producing crude areas the world over, and refining facilities convenient thereto, which give to that foreign competitor certain advantages in access in the world-wide market. Those are our allegations in the answer, and this is in proof. That is the purpose for which the chart has been prepared, as will be illustrated by the testimony of witnesses to come."
Also see objection to that exhibit (R. 137); statement of counsel for defendants as to Exhibit 143 (R. 138); cross-examination without objection by defendants of many witnesses (beginning with George Frankel) as to competitive conditions other than intercompany; direct examination by the government of various witnesses as to business of other companies  for example, Wolowich (R. 203), Rieber (R. 231), Stewart (R. 244), O'Sullivan (R. 252), Leavitt (R. 538); Government Exhibits 126 and 127 which were offered "to show the growth and dominant position of Standard Oil Company of New York since the entry of the original decree of dissolution in this case" (R. 559); much evidence as to price control by Socony and as to the financial standing of each of the two companies and of the merger; Government Exhibits 128 and 129 which have to do with relation of Socony to the general competition  not to intercompany  (see these exhibits and R 562-4); and Government Exhibits 130, 131, and 132.
The position of the defendants is set forth in a statement by counsel at the beginning of their evidence which is important in several respects. It expressly admits that the plaintiff would be entitled to a judgment on the pleadings, if its construction of the decree were correct, and, if the testimony were being taken before the court, defendants would move for judgment without introducing any testimony, but since it is being taken before a master, they will introduce evidence as to why the merger is taking place which will "require some description of the business of the two companies and its relation to the business of the industry as a whole." R. 588. There is reiteration of the contentions of defendants and insistence upon them, with no suggestion of any sort of waiver or abandonment of any part thereof. R. 578-588. The character of the testimony (direct and cross-examination) of all of defendants' witnesses and most of their exhibits is very significant as bearing directly upon the question of violation of the act, and little, or not at all, on the existence of intercompany competition, which had theretofore been expressly admitted by defendants.
As to the Briefs. In the main brief for the government, the supposed dominant position of the two companies in the industry is stressed (pages 5-15, 25). Also heading III (page 52) of the brief argues "that the proposed merger * * * would tend to bring about a combination or conspiracy like the one dissolved by the decree. * * * If the merger should be allowed, Socony would be rid of not only the present substantial competition of Vacuum, but the great potential competition of that company, and it would strengthen its already dominant position in New York and the New England States" (page 54), and see the entire argument under this heading, particularly beginning with last paragraph (pages 55, 58) and statement (page 61): "But unless the court holds that the decree forbids all combinations of potentially competitive defendants, regardless of effect, its decision in this case must rest on its view of whether or not the merger, if allowed, would tend to bring about an unlawful monopoly or restraint of trade." As to the main brief of defendants, see points argued which show that they repeatedly contended that this merger is no violation of the act. As to the reply brief, see pages 6-8, 12-15, and 16-21; at page 7, the statement refers to Socony's dominant position in New York and New England to be "a position which, if enhanced by the resources of Vacuum, would increase its present power to eliminate competition and strengthen its power to restrain trade."
As to rejoinder brief, see pages 5, 8-15, 22-27.
As to the Oral Argument. As shown by our notes of the oral argument, Mr. O'Brian stated that, if the government claimed there was any violation of the Sherman Act, they would be before another tribunal in another case; that the government does not admit that the merger does not violate the Anti-Trust Act, but it has not tried, in this case, to prove such violation; that the questions of fact are: How far are the parties engaged in actual competition? How far in potential competition? that the present merger has a tendency to violate the Anti-Trust Act, and is therefore within the decree. Both Mr. Hines and Mr. Hocker state that the government does not claim violation of the act. Yet both sides argue the broad facts of the industry; the relation of these companies thereto; the supposed dominance of Socony in New York and New England; and the status in the industry of the companies as merged.
To Summarize. The pleadings tendered the issue of law as to construction of the decree and an issue of fact (as to violation of the act by the merger) if defendants' construction be declared correct. The opening statement of counsel for the government undertook to avoid the above issue of fact, and so, in a sense, did that of defendants. Both parties introduced a mass of evidence which had no logical bearing whatever upon anything in the case except the above issue of fact as to violation of the act. In the briefs, the government contends, in one part along the lines of not being interested in violation of the act, and in another discusses facts pertinent only upon that matter, and says that, if this court holds such merger is not absolutely forbidden, regardless of effect, by the decree, then the "decision in this case must rest on its [this court's] view of whether or not the merger, if allowed, would tend to bring about an unlawful monopoly or restraint of trade." The defendants in their briefs insist upon their construction, and argue facts which have no relation to anything except whether the act is violated or not by the merger. In the oral argument, plaintiff's counsel expressly disclaim any admission that the act is not violated.
In this situation, it seemed clear that this issue of fact was tendered by the pleadings; that our construction of the decree made it necessary to determine that issue in order to enter a decree as to violation of the old decree; that the plaintiff expressly disclaimed any admission that the merger would not violate the act (and, therefore, the decree), and defendants made no waiver nor abandonment of the issue tendered in their answer. Therefore, we have seen no escape from examination of this mass of complicated evidence as the only way in which we can determine this issue of fact and therefore be able to enter a decree. That the plaintiff disclaims any attempt to prove violation of the act cannot alter the situation because the issue is tendered, is vital to a decision, and is not admitted by plaintiff nor abandoned by defendants. We must take the issues as the parties have framed them, and must determine such issues as are necessary to arrive at a decision and decree on the ultimate matter presented by this supplemental proceeding: which is, whether or not this merger will violate the old decree.
[3] That threat exists when acts are done in pursuance of an intention to create a monopoly, because an attempt to do any injury to the public may be forbidden  there is no legal limitation that prevents the door being closed to the first act of harmful entrance. Here no such intent or purpose is contended for or shown by the evidence. But it is the evils to the public of monopoly which make it prohibitable, and those evils may result entirely independently of any unlawful intent or purpose, and are not dependent upon the means or method whereby the monopoly came into being.
[4] U. S. v. Southern Pac. Co., 259 U. S. 214, 230, 42 S. Ct. 496, 66 L. Ed. 907; U. S. v. Amer. Linseed Oil Co., 262 U. S. 371, 389, 43 S. Ct. 607, 67 L. Ed. 1035; U. S. v. Reading Co., 253 U. S. 26, 57, 40 S. Ct. 425, 64 L. Ed. 760; Nash v. U. S., 229 U. S. 373, 376, 33 S. Ct. 780, 57 L. Ed. 1232; U. S. v. Pacific & Arctic Co., 228 U. S. 87, 104, 33 S. Ct. 443, 57 L. Ed. 742; U. S. v. Winslow, 227 U. S. 202, 217, 218, 33 S. Ct. 253, 57 L. Ed. 481; U. S. v. Reading Co., 226 U. S. 324, 369, 33 S. Ct. 90, 57 L. Ed. 243; U. S. v. Amer. Tobacco Co., 221 U. S. 106, 179, 180, 31 S. Ct 632, 55 L. Ed. 663.
[5] Geddes v. Anaconda Mfn. Co., 254 U. S. 590, 41 S. Ct. 209, 65 L. Ed. 425; U. S. v. U. S. Steel Corporation, 251 U. S. 417, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121; Eastern States Lumber Ass'n v. U. S., 234 U. S. 600, 610, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Nash v. U. S., 229 U. S. 373, 376, 33 S. Ct. 780, 57 L. Ed. 1232; U. S. v. Terminal Railroad Ass'n of St. Louis, 224 U. S. 383, 404, 409, 32 S. Ct. 507, 56 L. Ed. 810; Standard Oil Co. v. U. S., 221 U. S. 1, 60, 80, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734.
[6] Geddes v. Anaconda Min. Co., 254 U. S. 590, 594, 41 S. Ct. 209, 65 L. Ed. 425; U. S. v. U. S. Steel Corporation, 251 U. S. 417, 444, 40 S. Ct. 293, 64 L. Ed. 343, 8 A. L. R. 1121.
[7] In approaching the examination of the businesses of these two companies and, thereafter, the place in the industry of these two companies and the effect of the merger, we are embarrassed by a matter of the form of statement. While counsel upon both sides have most commendably concentrated the evidence, yet there is, necessarily, a large amount of data and statistics which must be examined and digested, and from which generalizations must be made. This opinion would be much abbreviated and the outstanding considerations more forcibly stated if we confined ourselves to stating only our general deductions from the evidence. However, we are sensible that this case will probably be appealed, no matter how we may determine it, and that the Supreme Court may have to examine the same mass of varied and often complex evidence which is here. We deem it, our duty to give such possible aid as we may to save the labor to that court, or, at least, to make it easier to examine the bases of our conclusions of fact by many references to the evidence from which they are drawn. These considerations lead us to largely confine ourselves, in the opinion proper, to the statement of generalizations and to place in designated footnotes the more detailed references.
[8] A general officer of Vacuum (H. F. Sheets) testified: "* * * We rather reverse the usual procedure of refining in that our guide is the requirement of the machine rather than the need to distribute our lubricating oil which is ordinarily [by others] produced incidental to the refining for gasoline." Studies are made of all important kinds and makes of machines of every sort and oils and greases developed to meet the lubrication needs of each, so that a Vacuum salesman anywhere in the world can immediately consult his charts and data and tell a factory, ship, or automobile owner what oils or greases are best adapted to his make of machine.
[9] It seems that the sale of gasoline, kerosene, and fuel-oils is an important feature of the foreign trade of Vacuum  whether for business reasons relating to its lubricants or from a long-established form of business methods in those fields or for some other reason is not made clear in the evidence.
[10] While this crude provides about 10 per cent. of the amount refined by Vacuum, it is only 4.4 per cent. of the amount necessary to produce the various products distributed by it  such distribution including refined products purchased from others for resale. This production in 1924 was 103,343 barrels; in 1925, 729,623 barrels; 1926, 878,211 barrels; in 1927, 1,231,866 barrels; in 1928; 890,913 barrels; in 1929, 1,264,453 barrels; in first six months of 1930, 546,304 barrels. For the past two or three years the production has remained about the same, with a reduction in 1928.
[11] The two largest refineries are at Paulsboro, N. J. (near Philadelphia) with a capacity of 20,000 barrels, and at Olean, N. Y., with a capacity of 6,500 barrels. There is another near Chicago (capacity 3,500 barrels), and the "skimming plant" is at East St. Louis, III. The foreign refineries were established mainly to meet tariff conditions, and are located as follows: Two in Germany, one each in Poland, Czecho-Slovakia, and Hungary, with a "topping plant" in Austria.
[12] Its total sales of all products, in 1929, were 13,973,120 barrels, of which 9,089,818 barrels were sold abroad and 4,883,302 barrels were sold in the United States. For 1929, Vacuum sales of various products, abroad and in the United States were as follows:

Foreign sales: Lubricants, 2,087,506 barrels; gasoline, 4,309,827 barrels; kerosene, 2,328,066 barrels; fuel, diesel, gas, and furnace oils, 255,683 barrels; miscellaneous, 108,736 barrels.
In United States: Lubricants 1,302,732 barrels; gasoline, 2,498,025 barrels; kerosene, 100,829 barrels; fuel, etc., oils, 899,635 barrels; miscellaneous, 82,081 barrels.
Total business: Lubricants, 3,390,238 barrels; gasoline, 6,807,852 barrels; kerosene, 2,428,895 barrels; fuel, etc., oils, 1,155,318 barrels; miscellaneous, 190,817 barrels.
[13] The number of retail or dealer outlets in the United States for Vacuum has actually decreased about 19.2 per cent. in the last four years. Added to this, the tendency is for the integrated companies to absorb or install the larger, better type and better located filling stations, so that not only the number but also the effective character of the Vacuum outlets was diminished.
[14] In these ten states the controlled outlets with the number of towns and cities in which located were as follows: Pennsylvania, 173 locations in 87 places; Missouri, 73 locations in 2 places; Ohio, 64 locations in 8 places; Wisconsin, 63 locations in 48 places; Illinois, 54 locations in 25 places; New York, 46 locations in 24 places; Michigan, 27 locations in 3 places; Indiana, 13 locations in 1 place; Iowa, 5 locations in 4 places; Minnesota, 4 locations in 4 places. In the same states there were dealer outlets for both Vacuum gasoline and automobile lubricants, supplied by Vacuum subsidiaries, as follows: Pennsylvania, 1,413 dealers in 711 places; Missouri, 136 dealers in 16 places; Wisconsin, 123 dealers in 85 places; New York, 88 dealers in 29 places; Illinois, 57 dealers in 33 places; Indiana, 48 dealers in 24 places; Ohio, 43 dealers in 14 places; Michigan, 39 dealers in 14 places; Iowa, 18 dealers in 16 places; Minnesota, 11 dealers in 9 places. In addition to these ten states, small quantities of gasoline were sold in New Jersey (7,671 barrels), Massachusetts (6,937 barrels), and Vermont (166 barrels).
[15] Out of 2,498,025 barrels of such gasoline distributed by Vacuum in 1929, 2,089,297 barrels were in Western New York, Pennsylvania, Ohio, New Jersey, and Eastern Missouri, all of which are tributary to the refineries at Paulsboro or Olean or to the "skimming plant" at East St. Louis. The balance being as follows: Michigan, 153,061 barrels; Wisconsin, 135,705 barrels; Indiana, 48,824 barrels; Illinois, 38,510 barrels; Iowa, 16,023 barrels; Minnesota, 9,491 barrels; Massachusetts, 6,937 barrels; Vermont, 166 barrels.
[16] The number and daily capacities of these refineries, by states, are as follows: California, four refineries, capacity 97,500 barrels; Kansas, one refinery, capacity 12,000 barrels; New York, three refineries, capacity 24,000 barrels; Texas, six refineries, capacity 78,000 barrels; Wyoming, one refinery, capacity, 8,000 barrels; Rhode Island, one refinery, capacity, 10,000 barrels.
[17] Its sales, by classified products, were as follows:

In the United States  gasoline, 26,050,002 barrels; fuel, diesel, gas, and furnace oils, 25,683,589 barrels; kerosene, 2,450,995, barrels; lubricants, 1,221,856 barrels; miscellaneous, 1,973,065.
Foreign countries  gasoline, 1,723,021 barrels; fuel, etc., oils, 3,334,881 barrels; kerosene, 5,764,083 barrels; lubricants, 691,154 barrels; miscellaneous, 450,848 barrels.
Total business  gasoline, 27,773,023 barrels; fuel, etc., oils, 29,018,470 barrels; kerosene, 8,215,078 barrels; lubricants, 913,010 barrels; miscellaneous, 2,423,913 barrels.
[18] An inspection of Government Exhibit 1A, which gives the amounts of each class of products for every state, reveals the difficulty of generalizing as to the business of Socony in the states, because of the diversity between quantities and classes of products sold in different states.
[19] At all of these both Socony automotive lubricants and gasoline are handled, although in the greater number of "dealers" other oils (including Vacuum) than those of Socony are also sold, and many "dealers" sell other gasolines also. Of these outlets, 9,839, in 3,988 cities or towns were owned or operated  of which 6,189 were in New York and the New England States and 2,205 in the far Western States (Arizona, California, Oregon, and Washington). Of the 27,138 dealers, 17,332 were in New York and New England, 4,394 in Texas, 1,433 in Arkansas, and 1,199 in Oklahoma.
[20] The statistics employed in the following discussion of foreign trade of these two companies are largely taken from Government Exhibits 2A and 2B.
[21] In two instances, the countries are grouped as to Vacuum statistics: South China, Indo-China, Siam, Philippines, Dutch East Indies, and Straits Settlements being in one group, and India (including Arabia and Persia), Burma, and Ceylon being in another. In the first group, Socony sold 78,007 barrels, Vacuum 86,536 barrels; in the second, Socony 255,007 barrels, Vacuum 84,068 barrels. The other nine countries, with sales, are: North China, Socony 103,486 barrels, Vacuum 16,710 barrels; Japan (including Korea and Formosa), Socony 90,425 barrels, Vacuum 80,699 barrels; Syria (including Cyprus and Cilicia), Socony 4,845 barrels, Vacuum 4,197 barrels; Greece, Socony 20,123 barrels, Vacuum 5,665 barrels; Turkey, Socony 19,015 barrels, Vacuum 2,226 barrels; Jugo-Slavia, Socony 58,051 barrels, Vacuum 9,811 barrels; South Africa, Socony 17,747 barrels, Vacuum 90,933 barrels; Australia, Socony 33,028 barrels, Vacuum 168,860 barrels; Canada, Socony 503 barrels, Vacuum 90,654 barrels.
[22] These types with amounts of each sold by each company in each country is shown on Government Exhibit 2B from which the statistics are here taken. Of these types, there are five in which one or the other company made no sales (Tanners Oil, Vacuum sold 7,489 barrels; Gargoyle Spec. Cyl. Oils, Vacuum sold 53,798 barrels; Process Oil, Socony sold 185,491 barrels; Mineral Seal, Absorb. Torch and Signal Oil, Socony sold 7,426 barrels; Base Oils, Socony sold 27,045 barrels). In the remaining nine types, the respective sales are as follows:

 Type Socony Vacuum Countries
 Premium Motor Oils.................... 12,271 barrels 46,007 barrels 8
 Other Motor Oils...................... 58,783 barrels 22,051 barrels 11
 Grease ............................... 30,973 barrels 32,236 barrels 11
 Transformer Oils ..................... 5,547 barrels 35,681 barrels 14
 Marine Oils .......................... 5,007 barrels 32,570 barrels 13
 Other Cyl. Oils....................... 54,054 barrels 21,536 barrels 15
 High Grade Spec. Mach. Eng. Oils...... 9,606 barrels 73,097 barrels 16
 Other Mach. and Engine Oils........... 269,500 barrels 114,269 barrels 17
 Sundries ............................. 14,741 barrels 10,811 barrels 14
 _______ _______
 460,482 388,258

From these totals it appears that 67.6 per cent. of the same classes of lubricants sold abroad by Socony and 60.7 per cent of those sold by Vacuum are in common markets. But an analysis of this competition (as shown by Government Exhibit 2B) reveals that in some instances the competition is not substantial because the sales of one or the other is practically nothing. For example: Other motor oils, Vacuum sells only 58 barrels in Turkey, while Socony sells 9,132; grease, Vacuum sells only 78 barrels in Turkey, while Socony sells 937; marine oils, Socony sells only 17 barrels in Jugo-Slavia, while Vacuum sells 323; other cylinder oils, Vacuum sells only 62 barrels in Turkey while Socony sells 1,111; high-grade spec mach. engine oils, Socony sells only 1 barrel in Syria (including Cyprus and Cilicia), and only 28 barrels in Jugo-Slavia, while Vacuum sells 1,071 and 2,554, respectively; sundries, Socony sells only 53 barrels in South China, Indo-China, Siam, Philippines, Dutch East Indies, and Straits Settlements combined, while Vacuum sells 1,476.
[23] Much of the data used will be taken from Government Exhibits 1A, 1B, 3, 4, 93-93e, 94, 126, 127b-127cc, and 130.
[24] A table of these sales by states is as follows:

 Socony Vacuum
 New York ................ 9,880,978 538,701
 Massachusetts ........... 3,583,758 6,939
 Vermont ................. 350,138 166
 Iowa .................... 46,548 16,032
 Minnesota ............... 327,532 9,491
 Missouri ................ 90,547 465,335
 Wisconsin ............... 96,650 135,705
 Ohio .................... 817 229,135
 Pennsylvania ............ 5,887 848,455

[25] See Government Exhibit 1B, which is as follows:

 Analysis of Sales of Lubricating Oils Other than Automotive Oils  by Socony and by Vacuum in
 Various Groups of States in 1929.
 (Barrels 50 Gal.)
 ====================================================================================================================
 | N.Y. and N.E. | Southwest1 | Other States | Miscellaneous*
 -------------------------------------------|-----------------|-----------------|----------------|-------------------
 | Socony Vacuum | Socony Vacuum | Socony Vacuum | Socony Vacuum
 -------------------------------------------|-----------------|-----------------|----------------|-------------------
 Transformer Oils ....................... | .... 68132 | .... 8356 | .... 180984 | .... ....
 Marine Oils ............................ | 652 40717 | .... 1480 | 781 15051 | .... ....
 Tanner's Oil ........................... | .... 2272 | .... 9 | .... 4151 | .... ....
 Process Oils ........................... | 89249 594 | .... 5 | .... 422 | .... ....
 Min. Seal, Torch, Signal & Absorbent ... | 18108 .... | .... .... | .... .... | .... ....
 Base Oils .............................. | 11115 .... | .... .... | 37476 .... | 63067 ....
 Gargoyle Spec. Cyl. (87c  $1.07 per | | | |
 gal.) ................................ | .... 8028 | .... 941 | .... 19236 | .... ....
 Other Cyl. Oils (25c  77c per gal.) ... | 47126 7863 | 11247 366 | .... 12451 | 366 ....
 High Grade Specialty Machine & | | | |
 Engine Oil (50c  $1.07 per gal.) .... | 6988 31191 | .... 6286 | .... 69194 | .... ....
 Other Mach. & Eng. Oils (15c  49c | | | |
 per gal.) ............................ | 209326 36410 | 16399 1857 | .... 51932 | 54976 ....
 Thread Cutting, Quenching & Soluble | | | |
 Oils ................................. | 15399 873 | .... 216 | .... 1029 | .... ....
 Sundries ............................... | 20404 794 | .... .... | .... 1897 | .... ....
 ----------------------------------------------------------------------------------------------------------------

 The classifications employed herein refer to the primary uses for which the various types of oil are manufactured. Certain unascertainable amounts of these oils are used for purposes other than those indicated.
1 Texas, Oklahoma, Arkansas, Louisiana, and New Mexico.
* Represents shipments f.o.b. refinery to other oil companies for the most part exported.
[26] This exhibit is as follows:

 Analysis of Sales of Automotive Lubricating Oils and Grease by Socony and by Vacuum* in Various
 Groups of States in 1929.
 (Barrels 50 Gal.)
 ====================================================================================================
 | Premium Motor Oils | Other Motor Oils | Grease
 ---------------------------------|---------------------|----------------------|---------------------
 | Socony Vacuum | Socony Vacuum | Socony Vacuum
 ---------------------------------|---------------------|----------------------|---------------------
 N. Y. & New England ............ | 57534 98561 | 295552 5626 | 29064 6852
 Southwest1 ..................... | 1700 44997 | 101462 2568 | 9325 560
 Pacific Coast2 ................. | 18917 59766 | 21627 3412 | 2281 ....
 Middle West3 ................... | 62998 156749 | 11315 8948 | 6880 2583
 Elsewhere ...................... | .... 302056 | .... 17242 | 522 20075
 | ____________________|______________________|_____________________
 Total ...................... | 141149 662129 | 429956 37796 | 48072 30070
 ----------------------------------------------------------------------------------------------------

* Vacuum acquired in 1930 subsidiaries which in 1929 sold 50,694 barrels of motor oils. As these subsidiaries will not handle Vacuum branded products, this amount has, for the purpose of this table, been divided between Premium and other oils in the proportion in which Vacuum's own total sales were divided in 1929.
1 Texas, Oklahoma, Arkansas, Louisiana, and New Mexico.
2 Washington, Oregon, California, Arizona, and Nevada.
3 Colorado, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, Wisconsin, and Wyoming.
[27] Out of a total of 136,295,880 barrels (50 gallons), Socony furnished 5.7 per cent. and Vacuum 4.7 per cent., or a combined 10.4 per cent of the whole  this although 66.7 per cent. of Vacuum and 19.2 per cent. of Socony business is foreign.
[28] There is evidence that the Pan-American refining capacity is 274,000 barrels daily, but the above figure is by the president of the company.
[29] In only one of such states (South Dakota) does it sell that much of all three classes. In only two others (Arkansas and Texas) does it sell that much in two of such classes (gasoline and lubricants).
[30] Confined to St. Louis and vicinity, Vacuum sells 10.7 per cent. of the fuel oil sold in Missouri. The other six states cover sales of lubricants.
[31] Percentage of New York and New England Consumption of Various Products Supplied by Socony in 1909 and by Socony and Vacuum in 1921.

 (Sales between Companies are eliminated)
 (Bbls. 50 Gals.)
 Year 1909
 Socony
 Product Barrels Total
 Gasoline ................. 1,396,334 92.5
 Kerosene ................. 1,928,637 90.6
 Fuel, Gas & Diesel Oil.... 6,161,577 *
 Lubricants ............... 500,723 *
 Misc. Pet. Products ...... 623,807 *
 __________________
 Total ................. 10,611,078
 Year 1929
 Combined
 Socony &
 Socony Vacuum Vacuum
-------------------------------------------------------------------------------------------
 % of % of % of
 Barrels Total Barrels Total Total
 Gasoline ............................... 17,106,881 33.7 545,806 1.1 34.8
 Kerosene ............................... 1,218,416 30.5 11,299 0.3 30.8
 Fuel, Gas & Diesel Oil & Furnace Oil.... 8,845,282 14.8 177,188 0.3 15.1
 Lubricants.............................. 800,517 20.9 295,294 7.7 28.6
 Misc. Pet. Products..................... 1,344,938 27.6 8,571 0.2 27.8
 ________________________________________________
 Total ............................... 29,416,034 23.8 1,038,158 0.8 24.6

* Not available, but it is estimated that Socony percentage closely approximated the percentage in gasoline and kerosene, with percentage of lubricants probably somewhat lower.
[32] Government Exhibits 93c and d are suggestive as to Vacuum expansion, although 93d is not confined thereto. Government Exhibits 127-B to CC show acquisition by Socony of 636 outlets since 1921  the majority being since 1927.
[33] These witnesses included the following: The president of the Richfield Oil Corporation (operating 500 marketing stations in New York, Massachusetts, Rhode Island, and Connecticut), who testified that he met some fifty to one hundred competitors, and that no company was a dominant factor in that territory. The treasurer of the Warner-Quinlan Company (operating 200 stations and supplying 200 more in New York, Connecticut, New Jersey, and Pennsylvania), who testified that he had "lots" of competition which was "keen all over," and from both large and small companies. The assistant to the manager of marketing for H. L. Doherty Company (City Service) which operates in many states, including New York, Massachusetts, Connecticut, Rhode Island, and (slightly) in New Hampshire, and has a refinery near Boston and is expanding. He testified that he had "plenty" of competition from large and small concerns. A vice president of the Texas Company (a large integrated company doing business in all of the states and abroad), who testified that in this territory he encountered "very much" competition, which was "very keen." The president of the Pan-American Petroleum & Transport Company (doing a large foreign business and on the Atlantic seaboard, except New York, and having selling stations in Massachusetts, Connecticut, Rhode Island, and Maine with a few in New Hampshire and Vermont), who testified that in such states he had "lots" of competitors. The treasurer of the American Oil Company of Massachusetts (a marketing concern operating or furnishing supplies to from 100 to 125 stations in Boston and vicinity), who testified that the business was "highly competitive"; that Socony dominated his territory in so far as number of stations and in prices until last February, when compelled to follow Shell prices. The president of the Hygrade Petroleum Company (a marketing concern operating about 250 stations in Western New York), who testified that competition was "very keen" and that he had never been able to determine which company dominated the territory. An owner of 4 stations in Brockton, Mass., and supplier of 4 other stations (sells about 500,000 gallons of gasoline annually) named competitors. The treasurer of Hall Bros. Company (operator of garage station selling about 250,000 gallons of gasoline annually at Concord, N. H., and the largest concern there), testified that the Gulf Company had been steadily expanding in New Hampshire and elsewhere in New England; that a great many other companies had come in  Shell recently and "very actively"; that his territory was "highly competitive." An operator of one station in Syracuse (annual sales 200,000 gallons of gasoline) showed competition. An operator of a station at Buffalo, N. Y. (annual sales 120,000 gallons of gasoline), testified "Texaco" Company dominated in distributions of gasoline or even up with Socony. An operator of eleven stations in Rochester, N. Y., testified the situation was overcompetitive; that many companies had come in within four or five years and engaged in extensive and active competition, establishing their own outlets by operating stations or through dealers. An operator of 3 stations in Worcester, Mass., testified to competition. An operator of one station in Syracuse, N. Y., testified to "many" competitors. An operator of 3 stations and supplier of 19 stations in and near Manchester, N. H. (500,000 gallons of gasoline annually), testified to many competitors and much competition. An operator of 16 stations in Quincy, Hingham, Scituate, Rockland, Duxbury, Nantasket, and Chelsea, Mass. (7,000,000 to 8,000,000 gallons of gasoline annually), testified competition was "quite keen" by numerous companies. An operator of a garage station at Jamestown, N. Y. (120,000 gallons of gasoline annually), testified to competitive conditions. An operator of 6 stations in and near New Haven, Conn. (over 1,000,000 gallons of gasoline annually), testified to extensive and keen competition by many companies, including most of the large companies. A sales manager of a company operating 18 stations in Buffalo, and supplying about 450 retailers in Western New York (about 30,000,000 gallons of gasoline annually), testified competition was "keen" and active; that most of the large companies have stations. A vice president of one of the largest retail and wholesale distributors at Rochester, N. Y. (operating 9 stations in Rochester, and supplying between 300 and 400 stations in Western New York), testified to keen competition with most of the large companies and many small ones participating. Secretary of a company operating 5 stations in Buffalo and Lockport, N. Y., and supplying 25 to 30 stations in Buffalo, showed competition. An operator of several stations in and near Cumberland, Me. (500,000 to 600,000 gallons of gasoline annually), testified to "active" competition between many companies. An operator of 18 stations and supplier of 50 to 75 stations in and within 25 miles of Rochester, N. Y. (3,000,000 to 4,000,000 gallons of gasoline annually), testified to rapid expansion of Beacon Company (subsidiary of Standard Oil Company of New Jersey). An operator of 2 stations and supplier of 35 stations in and near Jamestown, N. Y. (500,000 gallons of gasoline annually), testified to very strong competition between many companies. An operator of 20 stations and supplier of 30 to 40 stations in Rhode Island, Massachusetts, Connecticut, and New Hampshire testified that Tide Water Company does business widely through New England; much strong competition between many companies; petroleum products come into New England by water from a number of places, including California, Texas, Mexico, and Dutch West Indies; a number of companies have entered New England and expanded business there; a very highly competitive field wherein companies readily enter and establish business. An operator and supplier throughout Rhode Island and parts of Massachusetts and Connecticut testified the companies operating in his territory were "too numerous to mention," with stations "very well offset," and is highly competitive territory; both large and small concerns have come in and built up business. An operator of one station and supplier of 8 in and near Worcester, Mass. (1,500,000 gallons of gasoline annually), testified nearly all of larger companies competing in this territory. An operator of 3 stations and supplier of 200 stations in three Western New York counties (1,500,000 gallons of gasoline annually) testified competition "very keen" with ten of largest companies in field. A salesman of petroleum products to stations in Monroe county (Western New York) testified fourteen brands of gasoline sold in that territory. One of largest wholesale distributors to 500 to 600 stations and dealers in and near Rochester, N. Y., testified to large number of large and small competitors, some of which are expanding rapidly. An operator of 6 stations in Brockton, Mass., and supplier of about 100 stations in vicinity (2,000,000 gallons of gasoline annually), also seller of furnace oils, testified to large companies in territory. An operator of 16 stations and supplier of 200 to 300 stations along the Hudson River, from Albany to New Jersey (4-5,000,000 gallons of gasoline annually), testified to active competition by many large and small companies. A manager of a petroleum trade paper testified that New York and New England was a "highly competitive market," and very often is affected by "distress gasoline" coming in and affecting local prices. An operator of a station in East Rochester testified to keen competition with large and small companies. A refiner and distributor in Central New York testified to vigorous competition by many companies. A compounder and distributor of lubricants in a radius of 150 miles from Albany testified to active competition by many companies, including a number of companies specializing in lubricants. Comptroller of the Shell Eastern Petroleum Products (subsidiary of the Royal Dutch Shell) testified to rigorous and earnest expansion in New York and New England since February 4, 1929 (when it entered this field), with increasing business and extensively advertised. There was testimony to the same general effect by defendants, including a number of very enlightening exhibits (14 to 47g), which were mostly reports to Socony by its field men. These reports covered localities in every one of these States and a period from June, 1928, to June 1930.
[34] Comparative Analysis of Petroleum Products Sales in New York and New England States
 for the Year 1929.
 Estimated Shell
 Total Socony Vaccuum "A" Co. "B" Co. Eastern All Other
 Sales Sales Sales Sales Sales Sales Sales
 (bbls.) (bbls.) (bbls.) (bbls.) (bbls.) (bbls.) (bbls.)
 33.7% 1.1% 7.8% 11.5% 4.0% 41.9%
 Gasoline ............. 50,831,000 17,106,881 545,806 3,977,778 5,856,339 2,049,400 21,294,796
 30.5% .3% 3.4% .2% 65.6%
 Kerosene ............. 3,997,000 1,218,416 11,299 134,493 7,565 2,625,227
 14.8% .3% 1.2% 6.5% 6.6% 70.6%
 Fuel Gas and Furnace.. 59,784,000 8,845,282 177,188 712,038 3,920,480 3,954,830 42,174,182
 20.9% 7.7% 4.5% 2.3% .4% 64.2%
 Lubricants ........... 3,824,000 800,517 295,294 172,118 87,640 15,815 2,452,616
 27.6% .2% 14.9% 57.3%
 Misscellaneous ....... 4,867,000 1,344,938 8,571 726,711 2,786,780
 23.8% .8% 4.6% 8.0% 4.9% 57.9%
 Total ............. 123,303,000 29,316,034 1,038,158 5,723,138 9,864,459 6,027,610 71,333,801
 (Calculated in 50-gallon barrels).

[35] As to "B" Company, no kerosene and no miscellaneous products are shown, although there were such, but they were omitted because not furnished by that company. Also (as to that company) no unbranded lubricants are included and no industrial lubricants  the possible effect of the exclusion of industrial lubricants is evident from the facts that the lubricants credited to Socony included such, which were more than half of the entire amount (industrial over 418,000 barrels, automotive over 382,000 barrels). The only classes which seem reasonably accurate are gasoline and fuel oil, in which two Socony-Vacuum sold 34.8 per cent., and the other three 23.3 per cent., of gasoline, and Socony-Vacuum 15.1 per cent., and the other three 14.3 per cent., of fuel oil. Another matter affecting this showing is that the Shell sales cover only eleven months (that company beginning operation on Feb. 4, 1929).
[36] This testimony is found in the record at pages 189-191, 199-200, 228, 237, 240-242, 249-251, 256-257, 260-262, 267, 272-4, 277, 285-288, 291-2, 304-307, 319-323, 326-327, 331-333, 335-336, 340-342, 344-346, 352, 358, 360-364, 398-399, 407-409, 411-412, 415-417, 423-4, 431-432, 436-452, 458, 472-487, 493-494, 497, 501-502. Defendants' exhibits 14 to 47g, both inclusive.